## {Ramsey's Appeal.

An equitable right to set-off judgments is permitted only where it will infringe n no other right of equal grade; consequently it is not permitted to affect an equitable assignee for value.

An irregularity in the assignment of a judgment cannot be taken advantage of by a third person if the assignor make no objection to it.

When a set-off has been established for more than a plaintiff's demand, and the jury certify to the court a sum to be due to the defendant; such finding is not a lien on the defendant's real estate: it can be made so only by judgment on a *scire facias.*

An inquisition, in case of escheat, which does not find that the decedent died intestate, and without heirs or any known kindred, is a nullity; and a transcript of such finding is not a lien on the lands of him in whose hands the estate is found to be.

A mechanic's claim, which had not been filed within six months from the time of the completion of the building, and no action brought upon it, is not a lien.

He who may at law control the application of two or more funds, shall not be suffered to use his legal advantages in a way to exclude the demand of a fellow creditor whose legal recourse is restricted to but one of them.

A bank having a judgment against one of its stockholders, upon a sale of his real estate, is entitled to have out of the proceeds the amount of their judgment; but other judgment creditors, who are thereby deprived of their money, are entitled to be substituted to the rights of the bank, so as to enable them to levy and sell the bank stock of their debtor.

APPEAL from the common pleas of *Cumberland* county.

The real estate of William Ramsey deceased, was sold by the sheriff, and the proceeds brought into court for appropriation.

The Chambersburg Bank, having the first judgment, claimed to be paid the full amount. It was objected to by the subsequent judgment creditors, that Ramsey held stock in the bank upon which this claim was a lien, and that its amount should be defalked from the bank's judgment, and the balance only paid. The general creditors of the deceased insisted that the bank should take the whole of their judgment out of the money in court, and not deprive them of the stock, which was a personal fund, to which they would be entitled. The bank agreed to take either the stock or the money. The administrator of the decedent gave no assent to either appropriation. The court below decreed, that the bank stock should be defalked at its par value, and the balance of the judgment should be paid out of the money in court.

The Agricultural Bank had the next judgment and lien. This was objected to, that Ramsey had judgments against the bank to its full amount. But it appeared that a moiety of this claim had been transferred to the Bank of the United States by four trustees of the Agricultural Bank. To this it was replied, that it required five

[Ramsey's Appeal.]

trustees to make the assignment. The court was of opinion that the informality in the assignment could not be taken advantage of by any third person, and refused to allow the set-off, so as to affect the equitable assignment of the United States Bank, and decreed accordingly.

William Ramsey, in his lifetime, entered into an amicable action with the administrator of Andrew Mitchell, and they made this agreement.

It is agreed that the court of common pleas of Cumberland county appoint three referees to examine and ascertain the sum due to the plaintiff, if any thing, for fees received by Andrew Mitchell, esquire, as sheriff, belonging to plaintiff, and which was secured by the above recited recognizance, the report to be made into the office of the prothonotary, upon which judgment to be entered *de bonis*, the referees to meet at the house of Barnet Aughinbaugh, esquire, in the borough of Carlisle. *Ex parte* on four days notice.

The court appointed Robert M'Coy, Elisha Doyle and Frederick Sharretts as referees. Report filed, and arbitrators found in favour of the defendant, 392 dollars 46 cents.

Judgment *nisi*.

The court rejected this claim because it was not a judgment.

The commonwealth claimed the amount found to be in the hands of William Ramsey by an inquisition, in a proceeding to ascertain the amount of the estate of Jonathan Huston, escheated to the commonwealth. This claim was also rejected.

The next lien was a mortgage of James Buchannan, esquire. With regard to this, it appeared to be a lien upon that property alone, the proceeds of the sale of which were in court, and which were exhausted by the payment of the foregoing antecedent liens. It also appeared that Ramsey had other real estate, which had been sold by his administrator in pursuance of an order of the orphan's court, to an amount sufficient to pay all the liens which were prior in time to this mortgage. The mortgagee, therefore, objected to an appropriation of this fund to the payment of those judgments, because a sale had been made, and money enough raised by the administrator for their payment, and that they were, therefore, extinguished, and the plaintiffs must look to the administrator for their money. Or, if this position was not sustainable, the mortgagee then asked the court to subrogate him to the rights of those plaintiffs, that he might be entitled to have the money in the hands of the administrator. The court was of opinion, that the prior judgment creditors were entitled to their money out of this first and most accessible fund; and that the mortgagee was entitled to substitution.

Certain mechanics' claims were made which had been filed, but the proof was that they had not been filed within six months from the completion of the building, and they were rejected.

*Watts, Alexander* and *Carothers*, for subsequent judgment and gene-

ral creditors, contended, that the court erred in defalking the stock from the bank judgment and in substituting the mortgagee to the rights of the prior lien creditors; and on the latter point cited, 2 *Rawle* 132 ; Goswiler's Estate, 3 *Penns. Rep.* 203 ; Lawrence *v.* Cornell, 4 *Johns. Cha.* 546 ; Bank *v.* Stambaugh, 13 *Serg. & Rawle* 300 ; Sewall *v.* Lancaster Bank, 17 *Serg. & Rawle* 285 ; Mumford *v.* Murry, 6 *Johns. Rep.* 14.

*Biddle* and *Ellmaker*, contra, cited, Dorr *v.* Shaw, 4 *Johns. Cha.* 17 ; Hayes v. Ward, *Ib:* 132.

The opinion of the Court was delivered by

GIBSON, C. J.—Specific objections are made to the allowance or disallowance of particular liens, which are to be disposed of in their order; and first, of the lien held by the Bank of the United States, as an assignee of the moiety of a judgment obtained by the Pennsylvania Agricultural Bank. Judgments obtained against the latter bank for more than a moiety of the debt assigned, were held by the debtor in his lifetime, and ought now, it is contended, to be set off without regard to the rights of the Bank of the United States under the assignment, as it is supposed that an equitable transfer cannot stand in the way of the exercise of a legal right by the debtor. But there is a fallacy in supposing defalcation in a case like the present to be a legal right. Judgments are set against each other not by force of the statute, but by the inherent powers of the courts immemorially exercised, being almost the only equitable jurisdiction originally appertaining to them as courts of law. An equitable right of setting off judgments, therefore, is permitted only where it will infringe on no other right of equal grade ; consequently it is not to affect an equitable assignee for value. As to the objection that the assignment was executed but by four of the trustees, it is sufficient that the bank, whose agents they were, has not contested the transaction, as it was bound to do in a reasonable time had it meant to disaffirm it. The necessity of an early signification of dissent from an act done without authority, was recognised by this court in Gordon *v.* Preston, at the last term for the Lancaster district. 1 *Watts's Rep.* 385.

Exception is taken to the disallowance of a judgment on an award of money to the defendant, in an action in which the debtor was plaintiff. The reference was under the act of 1705, by the first section of which the jury are directed, when a set-off has been established for more than the plaintiff's demand, to find a verdict for the defendant, " and withal *certify* to the court how much they find the plaintiff to be indebted or in arrear to the defendant." The certificate thus made, is an appendage to the verdict, but no part of it, or of the premises on which the judgment is rendered ; for the judgment is not *quod recuperet,* but that the defendant go without day. On the contrary, it is expressly made a distinct and independent

cause of action by *scire facias*; and though a debt of record, it is not necessarily a lien, as was shown in Allen *v.* Reesor, 16 *Serg. & Rawle* 10, being made so only by judgment on a *scire facias.* Such is the proceeding where a surplus is found for the defendant by a jury. By the third section of the same act, it is provided that the adjustment of mutual accounts may be referred by rule of court to arbitrators whose award shall have the effect of a verdict; " and the party to whom any sum of money is thereby awarded, shall have judgment *or* a *scire facias* as the case may require, *as is hereinbefore directed concerning sums found and settled by a jury.*" That is, *reddendo singula singulis,* the plaintiff shall have judgment directly for money awarded to him, but the defendant shall have judgment for money awarded to him only intermediately, on a *scire facias* founded on the award, as in the case of a *scire facias* founded on the certificate of a jury. Why the *scire facias* should have been introduced in either case, can be explained only on the principle of a repugnance felt at an early day for an incongruity so striking as the direct recovery of money by the defendant; but the legislature has prescribed it, and it is not for the courts to dispense with it. . Though judgment was signed on the award, it was not for the money awarded, but that the defendant should be discharged from the action ; and by this he was left to become an actor in turn as the prosecutor of a *scire facias.* It is too plain then for further remark, that the part of the award which charged the plaintiff was not a lien.

Exception is taken also to the disallowance of the supposed lien of certain proceedings in escheat. By the second section of the act of the 29th of March 1823, an inquisition filed in the proper office, and finding an escheat to have occurred, is declared to be a lien on the real estate of those in whose hands any part of the escheated estate is found to be. In the inquisition produced here, it is not found that the decedent died intestate, and without heirs or any known kindred ; but that is said to be no more than an irregularity which cannot be admitted collaterally to destroy the properties of the instrument, just as irregularities in a judgment cannot be admitted collaterally to destroy the incident of its lien, while the judgment itself is suffered to stand. But a judgment itself may be treated as a nullity when it is deficient in an integral part; as may be collected from Helvete *v.* Rapp, 7 *Serg. & Rawle* 306, the record of which was barely saved from that consequence, by being found to contain the substance, though not the form, of all the essential parts of a judgment : and in The Philadelphia Bank *v.* Craft, 16 *Serg. & Rawle* 347, where a judgment confessed for a sum to be ascertained by the prothonotary, was held not to give a lien from the date, we have the very case. That is not all. By the act on which the lien depends, a copy of the inquisition is to be filed in the prothonotary's office for purposes of lien, only when an escheat is found to have occurred ; so that the omission of that indispensable fact is made fatal to the argument by the very words of the statute.

Exception is taken too, but not pressed, to the disallowance of certain mechanics' liens, in perpetuation of which claims had not been filed within the six months, nor actions brought,—to state the facts, is to show that the liens had expired.

But exception is confidently taken to the subrogation of the mortgagee, on whose sale the fund is brought into court, to the rights and capacities of the judgment creditors who are prior to him, and whose liens bound not only the mortgaged premises, but other lands of the mortgagor, previously sold by his administrator under a decree of the orphan's court, the proceeds of which are in his hands, equally subject to the judgments. I do not concur with the counsel of the mortgagee that the administrator's sale was *ipso facto* satisfaction of them *pro tanto*. No such effect is given to it by the statute which directs it, the lands sold being but exempted from the debts of the decedent in the hands of the purchaser ; and it was held in the Bank of Pennsylvania *v.* Winger, 1 *Rawle* 295, that it is one thing to divest a lien, and another to discharge the debt. But if there is any rule or principle of equity plainly, positively and incontrovertibly established on the basis of reason and authority, it is that he who may at law control the application of two or more funds, shall not be suffered to use his legal advantages in a way to exclude the demand of a fellow creditor, whose legal recourse is but to one of them. It is one of the most benign influences of equitable jurisdiction, that it adjusts the application of jarring liens according to their priority and value, in such a way as to produce a degree of satisfaction to all commensurate with their rights ; than which there can be no purer justice. Put it that to free his other lands from incumbrances the mortgagor had procured the prior judgment creditors so to apply their liens as to exclude the mortgagee from the benefit of his security altogether—would not common honesty have called upon the courts to rescue their process from such abuse ? The mortgagor would have felt himself insulted by the imputation of such an arrangement. And who are they that attempt to effect the same thing by setting up their legal rights as matters not to be touched by the doctrine of subrogation ? They are the general creditors of the mortgagor, who have succeeded to his rights by the operation of the intestate laws, and stand in his place as the residuary owners of his title. It is certain that the doctrine is one of mere benevolence, and that it is not to be extended to the infringement of legal rights ; as, for instance, by restricting a creditor to an inadequate fund, or in compelling him to take satisfaction in any way prejudicial to him. But what are the legal rights of the creditors? They are such as affect each other in the distribution of the assets, according to the priority of classes ; and they are consequently subordinate to equities which affected the debtor whom they collectively represent. The only error discernible in any part of the decree is, in the failure to apply the doctrine in its greatest breadth to the judgment of the Chambersburg Bank. Were the stock pledged to that bank of

a legal, definite and current value, the principle of satisfaction by defalcation might have been adopted with propriety; or had the administrator consented to let it go in satisfaction at the par or any other stipulated value, all would have been well enough, as he would have been answerable to the general creditors for any loss that might have occurred by a *devastavit*. But the court could not deprive those creditors of the possible benefit of an advance on a sale. To do exact justice to all, it will be necessary to turn the stock into cash by an execution on the judgment, without, however, delaying the bank in the mean time. It is therefore ordered, that so much of the decree as relates to the satisfaction of that judgment be reversed; that the judgment stand for the use of the mortgagee, who is subrogated to the rights and securities of the bank, with leave to proceed to execution of the stock pledged, crediting the proceeds on his mortgage; that the bank be permitted to take its money out of court in the mean time; and that the residue of the decree be affirmed.

Decree accordingly.