## Kountz *versus* Kirkpatrick & Lyons, to the use of Fisher.

1. K. sold to L., oil, " to be delivered seller's option at any time till December 31st, at 13½ cents per gallon. L. assigned the contract to F., and afterwards entered into a combination with many others to buy up oil," so as to raise the price in the market at the time K. was to deliver. *Held*, That F. was not affected by the acts of L., he having no connection with the combination.

2. In equity the assignee of a chose in action is the true owner : he may set it off as his own.

3. The assignee takes the chose subject to the equities between the original parties at the time of the assignment, and to payment, &c., on the chose before notice of the assignment, but is not affected by acts unconnected with the subject of the contract.

4. In the sale of chattels the general rule is, that the measure of damages for non-delivery, is the difference between the contract price and the price at the time and place of delivery.

5. When the market price is unnaturally inflated by unlawful means, it is not the true means of ascertaining the measure of damages for non-delivery.

6. The question of damages by a market value is for the jury : who may determine from the price *before* and *after* the day of delivery, and from other sources, the actual market value.

November 14th 1872. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Allegheny county* : No. 86, to October Term 1872.

This was an action of assumpsit, brought August 30th 1870, by Joseph Kirkpatrick and James Lyons, trading as Kirkpatrick & Lyons, to the use of Frederick Fisher and others, trading as Fisher Brothers, against William J. Kountz.

The claim was upon the following memorandum set out in the plaintiff's affidavit :—

" Pittsburg, June 7th 1869.

" Sold to Kirkpatrick & Lyons, two thousand barrels good, green merchantable crude petroleum, forty gallons to the barrel, gravity 40 to 46 degrees, at a temperature of 60° Fahrenheit, to be delivered—seller's option—at any time from this date, till December 31st 1869, in bulk cars or bulk boats, at Cosmos Oil Works. If delivered by Allegheny Valley or Western Pennsylvania Railroad, the buyer may designate any other point of delivery on line of said roads. If delivered by water, then at any good landing in or near Pittsburg buyer may direct. Payment to be made cash on delivery at the rate of thirteen and one-half cents per gallon, on lots as gauged and delivered.

W. J. KOUNTZ, Seller."

The affidavit further set out :—

" On the 31st day December 1869, the said defendant was duly notified, that the vendees of said oil were ready and willing to receive and pay for the same according to the terms of the

[Kountz v. Kirkpatrick.]

contract and demand was made of the defendant that he deliver the said oil according to the provisions of said contract; nevertheless the defendant on the day and year last aforesaid refused to deliver said oil, and never did deliver the same, or any part thereof, although the vendees were ready and willing to receive and pay for the same according to the provisions of said contract.

" On the 31st of December 1869, the market price of oil of the quality specified in said contract, and at the place of delivery therein mentioned was 18 cents per gallon; therefore, by reason of his (defendant's) failure to perform his said contract, the vendees of said oil, on the 31st day of December 1869, sustained and suffered loss and damage to the amount of $3600.

FREDERICK FISHER."

On the 14th of September 1870, judgment was taken by default against the defendant for $3753. On the 22d of September 1870, a rule was granted on the plaintiffs to show cause why the judgment should not be opened, and the defendant let into a defence; the rule was made absolute on the condition, that the defendant within five days file " a full and specific affidavit of defence, which shall be subject to the same rules of court as if the same had been filed before a judgment entered."

The affidavit of defence was as follows:

" That the said plaintiffs, Kirkpatrick & Lyons, between the 7th of June 1869, and the 31st of December 1869, with others, entered into a combination to purchase oil here in the county of Allegheny, as well as in the oil-producing districts of Pennsylvania and West Virginia, and keep it out of the market and thereby create a scarcity, and consequently enhance the price, for the purpose of preventing this affiant (and others who had entered into like writings of the character of the one on which this suit is brought) from fulfilling his engagement, set forth in said writing, so that they might reap great gains and profits, by receiving the difference between the price promised your affiant and the advanced price brought on as aforesaid, and in furtherance of said illegal object, the said plantiffs, with others, their confederates, used their influence and efforts to prevent oil from being brought to the city of Pittsburg, from the oil-producing districts for the purpose aforesaid; and further, said plaintiffs, with their confederates, for the purpose of preventing this affiant (and others who had entered into like writings with the one sued on) from fulfilling his said engagement; and from having oil shipped on the Allegheny Valley Railroad, to the city of Pittsburg, from oil-producing districts in the state of Pennsylvania, monopolized the freight-cars of said road (the river, most of the time, being too low to allow oil to be transported by water from the oil regions in the state of Pennsylvania to said city of Pittsburg), and rendered

[Kountz *v.* Kirkpatrick.]

it impossible for this affiant to fulfil his said engagement, as well
as others of a like kind, and said illegal proceedings, actions and
doings of the said plaintiffs (and others, their confederates), they,
the said plaintiffs, and others, their confederates, did succeed in
raising the price of oil between the aforesaid two dates from 13½
cents to 18 cents per gallon, thereby to a great extent contribu-
ting purposely to prevent this affiant from being ready and pre-
pared to deliver the 2000 barrels of oil, mentioned in said writing,
between the dates aforesaid; and this affiant would further state
(and is prepared to prove) that the fair market price of oil (such
as described in said contract sued on), on the 31st of December
1869, was considerably less than 18 cents per gallon. This
affiant expects to be able to prove the whole of the foregoing facts
upon the trial of this case, and this affiant would further aver, and
expect to prove on the trial of this case, that he would have
fulfilled his contract had it not been for the doings and actions of
said plaintiffs (and others, their confederates), above set forth, and
he would further state that as soon as the market was relieved
from the above combination, to wit, within a few days after the
31st of December 1869, he procured and tendered oil in fulfilment
of his said contract, and he would further aver that the object and
intention of the above combination on part of the said plaintiffs
(and others, their confederates) were to thwart and prevent him,
this defendant, from performing and fulfilling his said contract
within the time fixed in the same.            W. J. KOUNTZ."

On the trial, January 9th 1872, before Sterrett, P. J., the plain-
tiffs gave in evidence the record of the previous proceedings in this
case.

The defendant then gave evidence tending to show that the
legal plaintiffs, with a large number of other persons, holding
contracts similar to that in suit for the delivery of oil, entered
into a combination to raise the price by buying up oil, holding it
until after the last of the year, for the purpose of compelling the
defendant to pay large differences for non-delivery.

He gave other evidence tending to sustain the allegations of his
affidavit of defence, especially to show that the price of oil when
the delivery was to have been made, except that it had been un-
naturally raised by the combination, was much less than 18 cents.
His evidence, amongst other things, was that this combination had
been formed in the early part of October 1869.

The plaintiffs, in rebuttal, gave evidence, under objection and
exception, that Fisher Brothers had held the contract by assign-
ment from Kirkpatrick & Lyons since June 24th 1869, and had
given defendant notice within two weeks afterwards; the defendant
said it was all right. The contract had been originally made by
them for Fisher Brothers, who had no connection with the com-

bination, nor had they any anticipation of such combination when the assignment was made to them. There was a conflict in the evidence as to Fisher Brothers having given the defendant notice of the transfer.

The court was requested, by defendant's counsel, to charge the jury as follows:—

1. The contract sued on is not assignable.

"This point is refused. If Kirkpatrick & Lyons ever had any interest in the contract in their own right, it was competent for them to transfer that interest to the equitable plaintiffs, Fisher Bros., and if the assignment was made, as it appears by the endorsement on the contract, it would have the effect of transferring all their interest in the contract to Fisher Bros. Although such transfer, in and of itself, would not release them from their liability to Capt. Kountz, for the contract price of the oil, in case the assignees had refused to pay it on delivery."

2. If assignable, the assignees take it subject to all the equities then existing or that may thereafter arise up to the maturity of said contract.

"As a whole this point is refused. The first clause of it is correct, but the last is not."

3. Any defence that would prevent Kirkpatrick & Lyons from recovering in their own right will be effectual to bar a recovery in favor of their assignees, the equitable plaintiffs.

"This point is refused."

4. There is an implied undertaking or obligation in the contract sued on that the parties to it shall act in good faith towards each other in regard thereto, and if either one shall knowingly do any act or thing, for the purpose of circumventing the other, and thus prevent him from performing his part of the contract, the party thus acting cannot be allowed to recover damages from the other for his non-performance of the contract, nor can his assignees, no odds at what time the assignment took place, whether before or after the act of prevention.

"This point as a whole is refused. The first part of the proposition is correct, and if it stood alone, unconnected with the latter clause, we would affirm it. We cannot say that the assignees of such a contract as the one in suit, without regard to the time it was assigned to him, should be visited with the consequences of bad faith of his assignor, practised after the latter had parted with his interest in the contract. In other words, the assignee of such a contract is responsible only for his own bad faith after he has become the owner of the contract, and should not be prejudiced by any act of bad faith committed by the assignor after he parted with his interest."

5. The implied undertaking or obligation mentioned in the 4th point, is inherent in the contract sued on, and adheres to it, in

whosoever's hands it may be, by assignment or otherwise, and therefore the assignees of said contract, viz. Fisher Bros. (the equitable plaintiffs), took said contract subject to the said implied undertaking or obligation.

"This point is refused. If you find that the contract in suit was made at the instance of Fisher Bros., and for their benefit, and on the 24th of June 1869 was formally transferred and delivered to them by the legal plaintiffs, and the defendant was shortly afterwards notified of the transfer, no act of bad faith on the part of the legal plaintiffs, or any one else, could prejudice Fisher Bros., unless they in some way participated therein."

6. If the jury believe, from the evidence, that there was a combination entered into in the month of October 1869 (composed, among others, of Kirkpatrick & Lyons, the legal plaintiffs in this case), for the purpose of buying up from time of said combination to December 31st 1869, and withholding the same out of the market, the crude petroleum oil (of a gravity from 40 to 60), shipped to the city of Pittsburg, and produced in the oil-producing districts of Pennsylvania, and thereby create a scarcity and give a fictitious and artificial price to oil of the character above described, and this for the purpose, among others, of preventing the defendant (as well as others who had entered into like contracts) from fulfilling his contract sued on, and in fact did so prevent him, then the plaintiffs cannot recover.

"This point is refused. If this suit had been brought by Kirkpatrick & Lyons, in their own right, and for their own benefit, and we had no evidence of the assignment of the contract, this point would be a correct statement of the law applicable to the facts therein recited; as it stands, however, under the evidence it is refused."

7. The combination mentioned in the 6th point was illegal, and if Kirkpatrick & Lyons, the legal plaintiffs in this action, were parties thereto, and the action of said illegal combination had the effect of preventing the defendant from performing his part of the contract sued on, then the plaintiffs cannot recover.

"This point is refused for reasons already given."

8. If the said illegal combination mentioned in point 7th, was composed of Kirkpatrick & Lyons and others, and its actions and doings did stimulate the price of the crude oil described in point 6th, and give it a fictitious and artificial value, and thus render it more difficult and expensive for the defendant to fulfil his part of the contract sued on than it would have been, had not said illegal combination been formed, then and in that case the defendant was relieved from performance, and the plaintiff cannot recover.

"This point is refused."

9. If the illegal combination above referred to would be a de-

[Kountz *v.* Kirkpatrick.]

fence as against Kirkpatrick & Lyons, the legal plaintiffs, it will also avail as against their assignees the equitable plaintiffs, notwithstanding the defence arose after the assignment to said equitable plaintiffs, unless the defendant has estopped himself from pleading or setting it up against said assignees, and it devolves upon the plaintiffs to show such estoppel, if any exists.

"This point is refused."

10. The fact, if true as sworn to by Frederick Fisher, one of the equitable plaintiffs, that some two or three weeks after the assignment of the contract to said equitable plaintiffs, he informed the defendant, that the contract had been assigned, and the defendant replied "all right"—does not amount to an estoppel (because the defence had not then at the time of notice arisen), and because the defendant did not induce them by act or word to take the contract; nor did he know of it till long after the assignment had taken place.

"This point, so far as it is applicable to the facts of this case, is affirmed. If the defendant, when informed that the contract had been assigned, replied "all right," he would not thereby be estopped from setting up an equitable defence which then existed, but of which he was ignorant at the time. But as we have already said, after the assignment and notice thereof to defendant, the assignees could not be prejudiced by any subsequent act of the assignor, unless they were in some manner parties to it."

11. The equitable plaintiffs, Fisher Bros., took the assignment of said contract sued on, subject to all defences and equities existing at the time of the assignment and up to the time notice of said assignment was given to said defendant. And if the jury believe that notice of said assignment was not given defendant until after the formation of the illegal combination, composed of Kirkpatrick & Lyons, the legal plaintiffs, and others, for the purpose mentioned in point 6th, and that the said illegal combination did contribute materially to prevent the defendant from performing his part of the contract, then the equitable plaintiffs cannot recover.

"This point is refused for reasons already given."

12. The testimony of the defendant is, that he had no notice of the assignment of the contract sued on until the last of November or early part of December 1869, at least more than a month after the formation of said illegal combination, and if the jury believe his testimony in this respect, and that the said illegal combination prevented or materially contributed to prevent the defendant from performing his part of said contract, then the plaintiffs cannot recover.

"This point is refused. If the contract was assigned to the equitable plaintiffs, Fisher Bros., and delivered to them on the 24th of June 1869, they would not be affected by anything that was afterwards done by the alleged combination, or by any of the

parties composing it, even though defendant had no notice of the assignment until December 1869, unless it would appear that Fisher Bros. were parties to the combination, or so related to it as to be responsible for its acts. The object of giving notice of the assignment of a contract, such as the one before us, is that the party notified may not do, or omit to do anything in relation to the subject-matter of the contract, by which he would be prejudiced. If he has not been in any manner prejudiced by want of notice, he has no reason to complain that none was given. Assuming that the defendant had no notice of the assignment until December, is there anything in the evidence to show that in consequence thereof, he did anything to his prejudice or omitted anything to his advantage, which he would not have done, if he had been notified at the time of the transfer? We think not."

13. If the jury believe that Frederick Fisher, one of the equitable plaintiffs, advised the defendant to sell the oil mentioned in the contract sued on, and then went to Kirkpatrick & Lyons, and got them to buy the oil from the defendant, for his firm, Fisher Bros., on terms said F. Fisher advised him to sell, and Kirkpatrick & Lyons did so buy, then the said Fisher acted in bad faith, and there should be no recovery in this case.

"We refuse to affirm this proposition as stated. But if you find from the evidence that Frederick Fisher, with intent to deceive defendant and obtain an undue advantage of him, advised him to 'sell short, &c.,' and defendant acting upon such advice, offered the oil, and his offer was accepted by Kirkpatrick & Lyons, at the instance of Fisher, this would be such an act of bad faith on the part of Fisher as should prevent him from recovering. If, on the other hand, the defendant in a casual conversation, or conversations, with Fisher in the regard to the future prospects of the oil trade, asked his opinion in relation thereto, and Fisher without intending to mislead or deceive him, and thereby obtain an undue advantage of him, advised him to 'sell short,' the fact that defendant afterwards offered to sell and did sell to Kirkpatrick & Lyons for Fisher Bros., would not stand in the way of plaintiffs' recovery. As to the facts bearing on this question the defendant is contradicted by Fisher, who testifies that he never advised him to sell in any way. What the facts are you will determine.

14. If Frederick Fisher, one of the equitable plaintiffs, did advise the defendant to sell the oil mentioned in the contract sued on, on the terms therein mentioned, and then got Kirkpatrick & Lyons, the legal plaintiffs, to purchase the oil from said defendant on said terms, and the defendant had no notice of this arrangement until after suit brought (and there is no evidence that he ever had any notice of such an arrangement), then the plaintiffs ought not to recover.

[Kountz v. Kirkpatrick.]

" This proposition is too broadly stated, and in our opinion not fully justified by the evidence.   There is nothing in the testimony to show that Fisher advised defendant to ' sell short,' at any particular price.   In other respects our answer is the same as to the last preceding point.

15. If the jury should be of opinion, under the instructions from the court, that Fisher Bros. are entitled to recover, the court is requested to charge that in assessing the damage, they will first ascertain and determine what was the fair market value of crude oil per gallon, on the 31st of December 1869, and if they should find at that date it did not exceed 13½ cents per gallon, then the damages will be merely nominal.   If they find it exceeds 13½ cents per gallon, they will charge the defendant with whatever the excess is over 13½ cents on 80,000 gallons.

" This point is refused.   The judgment in this case was opened, on condition that defendant should fully comply with the rules of court in relation to the affidavits of defence.   The plaintiffs had filed an affidavit of claim, in which they distinctly averred the market price of oil in Pittsburg on the 31st day of December 1869, and claimed the difference between that and the contract price.   This part of plaintiffs' affidavit of claim is not distinctly traversed or denied, as the rule of court requires, and is therefore to be taken as admitted."

The verdict was for the plaintiffs for $3753, with interest from September 14th 1870.

The defendant took out a writ of error: he assigned for error :—

1. The admission of plaintiffs' evidence objected to.

2–16. The answers to the defendant's points.

None of the errors except the 9th and 10th were assigned in accordance with the rules of the Supreme Court.

*S. H. Geyer* and *G. Shiras, Jr.*, for plaintiff in error.— Kountz's assent to the contract when notified of its assignment to Fisher, could not affect them in reference to a combination of which he had no knowledge: Buchanan *v.* Wurtz, 5 Watts 151 ; Ludwick *v.* Croll, 2 Yeates 464.   The contract bound the parties to the exercise of good faith towards each other in regard to it during its executory character, and the violation of this duty, by one of the contracting parties, to the detriment of the other, will exonerate him from performance of his part of the contract : Borden *v.* Borden, 5 Mass. 67 ; Whitney *v.* Spencer & Grant, 4 Cowen 39 ; The People *v.* Bartlett, 3 Hill's Reports 571 ; 2 Parsons on Contracts 189 ; Sergeant *v.* Ingersoll, 7 Barr 340 ; Addison on Contracts, American Notes, 880–1122.

The exercise of good faith on part of the contracting parties, in regard to their contract, is an essential element of the contract itself.

[Kountz *v.* Kirkpatrick.]

As to damages the inquiry is, what was the value at the time fixed for delivery, taking into consideration all proved facts, of price and sale, and all rational and distinct probabilities, and nothing more : 2 Parsons on Contracts 482 ; Smethurst *v.* Woolston, 5 W. & S. 106.

*M. W. Acheson*, for the defendants in error, cited 1 Parsons on Contracts 193 *et seq.* After notice of the assignment has been given, the equitable interest of assignee is protected against all interference of the original parties : 2 Story on Contracts, sect. 376 n. ; Corser *v.* Craig, 1 Wash. C. C. R. 424 ; Mandeville *v.* Welch, 5 Wheaton 277 ; Davis *v.* Barr, 9 S. & R. 137, 141 ; Taylor *v.* Gitt, 10 Barr 428 ; Cook *v.* Ambrose, Addison 323.

The original judgment in this case having been merely opened to let the defendant into a defence, needed no support at the outset, but stood good unless a legal or equitable payment, discharge or other defence was established : Cannell *v.* Crawford County, 9 P. F. Smith 196. The Supreme Court will not reverse for any construction given by the Court of Common Pleas to its own rules which is not palpably erroneous : Wickersham *v.* Russell, 1 P. F. Smith 71 ; Frank *v.* Colhoun, 9 Id. 381 ; Bigoney *v.* Stewart, 18 Id. 318.

The standard of damages for non-delivery of an article is the difference between the contract and the market price at the time and place of delivery : Fessler *v.* Love, 12 Wright 407 ; Sedg. on Measure of Damages 295, 296, note 1. The amount of compensation, or measure of damages is, as a general rule, matter of law, to be disposed of by the court : Sedg. on Measure of Damages 27, 545, 639 ; Smith *v.* Griffith, 3 Hill 33.

The opinion of the court was delivered, January 6th 1873, by
AGNEW, J.—The second, third, fifth, sixth, seventh, eighth, eleventh, twelfth, thirteenth, fourteenth, fifteenth and sixteenth errors, are not well assigned, for all the answers of the court to the points were omitted. When a court simply refuses a point, the error is well assigned by reciting the point, and stating that it was refused. But when the judge answers specially, in order to introduce a qualification he deems necessary to make his instruction correct, the answer must be recited as well as the point. We shall not decline considering, however, all the important questions ; and in order to discuss them, we may state succinctly the nature of the case. On the 7th of June 1869, Kountz sold to Kirkpatrick & Lyon, two thousand barrels of crude petroleum, to be delivered at his option, at any time from the date, until the 31st of December 1869, for cash on delivery, at thirteen and a half cents

[Kountz v. Kirkpatrick.]

a gallon.   On the 24th of June 1869, Kirkpatrick and Lyon assigned this contract to Fisher & Brothers.   Kountz failed to deliver the oil.   He defends on the ground that Kirkpatrick & Lyons, and others holding like contracts for delivery of oil, entered into a combination to raise the price, by buying up large quantities of oil, and holding it till the expiration of the year 1869, and thus to compel the sellers of oil on option contracts, to pay a heavy difference for non-delivery.   Fisher & Brothers, the assignees of Kountz's contract, were not in the combination, and the principal questions are whether they are affected by the acts of Kirkpatrick & Lyons, subsequent to the assignment; whether notice of the assignment to Kountz was necessary to protect them, and what is the true measure of damages.   The court below held that Fisher & Brothers, as assignees of the contract, were not affected by the acts of Kirkpatrick & Lyons, as members of the combination in the following October and subsequently, and that notice in this case was not essential to the protection of Kountz.

The common-law rule as to the assignability of choses in action no longer prevails, but in equity the assignee is looked upon as the true owner of the chose.   He may set off the demand as his own : Morgan v. Bank of North America, 8 S. & R. 73 ; Ramsey's Appeal, 2 Watts 228.   The assignee takes the chose subject to the existing equities between the original parties before assignment, and also to payment and other defences to the instrument itself, after the assignment and before notice of it; but he cannot be affected by collateral transactions, secret trusts, or acts unconnected with the subject of the contract : Davis v. Barr, 9 S. & R. 137 ; Beckley v. Eckert, 3 Barr 292 ; Mott v. Clark, 9 Id. 399 ; Taylor v. Gitt, 10 Id. 428 ; Northampton Bank v. Balliet, 8 W. & S. 318 ; Corsen v. Craig, 1 Wash. C. C. R. 424 ; 1 Parsons on Cont. 193, 196 ; 2 Story on Cont., § 396, n.

The act of Kirkpatrick & Lyons, complained of as members of an unlawful combination to raise the price of oil, was long subsequent to their assignment of Kountz's contract, and was a mere tort.   The contract was affected only by its results as an independent act.   It does not seem just, therefore, to visit this effect upon Fisher & Brothers, the antecedent assignees.   The act is wholly collateral to the ownership of the chose itself, and there is nothing to link it to the chose, so as to bind the assignors and assignees together.   After the assignment, there being no guaranty, the assignors had no interest in the performance of this particular contract, and no motive, therefore, arising out of it to raise the price on Kountz.   The acts of Kirkpatrick & Lyons seem, therefore, to have no greater or other bearing on this contract than the acts of any other members of the combination, who were strangers to the contract.

22 P. F. Smith—25

[Kountz *v.* Kirkpatrick.]

In regard to notice of the assignment to Kountz, it is argued, that having had no notice of it, if he knew of the conspiracy to raise the price of oil, and thus to affect his contract, and that Kirkpatrick & Lyons were parties to it, he might have relied on that fact as a defence, and refused to deliver the oil, and claimed on the trial a verdict for merely nominal damages for his breach of his contract. Possibly in such a special case, want of notice might have constituted an equity, but the answer to this case is, that no such point was made in the court below, and there does not seem to be any evidence that Kountz knew of the conspiracy, and Kirkpatrick & Lyons's privity, and relying on these facts, desisted from purchasing oil to fulfil his contract with them. As the case stood before the court below, we discover no error in the answers of the learned judge on this part of it.

The next question is upon the proper measure of damages. In the sale of chattels, the general rule is, that the measure is the difference between the contract price and the market value of the article at the time and place of delivery under the contract. It is unnecessary to cite authority for this well established rule, but as this case raises a novel and extraordinary question between the true market value of the article, and a stimulated market price, created by artificial and fraudulent practices, it is necessary to fix the true meaning of the rule itself, before we can approach the real question. Ordinarily, when an article of sale is in the market, and has a market value, there is no difference between its value and the market price, and the law adopts the latter as the proper evidence of the value. This is not, however, because value and price are really convertible terms, but only because they are ordinarily so in a fair market. The primary meaning of value is worth, and this worth is made up of the useful or estimable qualities of the thing: See Webster's and Worcester's Dictionaries. *Price*, on the other hand, is the sum in money or other equivalent set upon an article by a seller, which he demands for it: Id. Ibid. Value and price are, therefore, not synonymes, or the necessary equivalents of each other, though commonly, market value and market price are legal equivalents. When we examine the authorities, we find also that the most accurate writers use the phrase market *value*, not market price. Mr. Sedgwick, in his standard work on the measure of damages, 4th ed. p. 260, says: " Where contracts for the value of chattels are broken by the vendor's failing to deliver property according to the terms of the bargain, it seems to be well settled, as a general rule, both in England and the United States, that the measure of damages is the difference between the contract *price* and the market *value* of the article at the time it should be delivered upon the ground; that this is the plaintiff's real loss, and that with this sum, he can go into the market and

[Kountz v. Kirkpatrick.]

supply himself with the same article from another vendor." Judge
Rogers uses the same term in Smethurst v. Woolston, 5 W. & S.
109 : " The *value* of the article at or about the time it is to be
delivered, is the measure of damages in a suit by the vendee against
the vendor for a breach of the contract." So said C. J. Tilghman,
in Girard v. Taggart, 5 S. & R. 32. Judge Sergeant, also, in
O'Conner v. Forster, 10 Watts 422, and in Mott v. Danforth, 6
Id. 308. But as even accurate writers do not always use words
in a precise sense, it would be unsatisfactory to rely on the common
use of a word only, in making a nice distinction between terms.
It is therefore proper to inquire into the true legal idea of damages
in order to determine the proper definition of the term value.
Except in those cases where oppression, fraud, malice or negligence
enter into the question, " the declared object (says Mr. Sedgwick,
in his work on Damages) is to give *compensation* to the party in-
jured for the actual loss sustained," 4th ed., pp. 28, 29 ; also, pp.
36, 37. Among the many authorities he gives, he quotes the
language of C. J. Shippen, in Bussy v. Donaldson, 4 Dallas 206.
" As to the assessment of damages (said he), it is a rational and
legal principle, that the compensation should be equivalent to the
injury." " The rule," said C. J. Gibson, " is to give actual com-
pensation, by graduating the amount of the damages exactly to
the extent of the loss." " The measure is the actual, not the
speculative loss :" Forsyth v. Palmer, 2 Harris 97. Thus, com-
pensation being the true purpose of the law, it is obvious that the
means employed, in other words, the evidence to ascertain com-
pensation, must be such as truly reaches this end.

It is equally obvious, when we consider its true nature, that as
evidence, the market price of an article is only a means of ar-
riving at compensation ; it is not itself the value of the article,
but is the evidence of value. The law adopts it as a natural in-
ference of fact, but not as a conclusive legal presumption. It
stands as a criterion of value, because it is a common test of the
ability to purchase the thing. But to assert that the price asked
in the market for an article is the true and only test of value, is
to abandon the proper object of damages, viz., compensation, in
all those cases where the market evidently does not afford the true
measure of value. This thought is well expressed by Lewis, C. J.,
in Bank of Montgomery v. Reese, 2 Casey 146. " The para-
mount rule in assessing damages (he says), is that every person un-
justly deprived of his rights, should at least be fully compensated
for the injury he sustained. Where articles have a determinate
value and an unlimited production, the general rule is to give their
value at the time the owner was deprived of them, with interest
to the time of verdict. This rule has been adopted because of its
convenience, and because it in general answers the object of the

law, which is to compensate for the injury.  In relation to such articles, the supply usually keeps pace with the demand, and the fluctuations in the value are so inconsiderable as to justify the courts in disregarding them for the sake of convenience and uniformity. In these cases, the reason why the value at the time of conversion, with interest, generally reaches the justice of the case, is that when the owner is deprived of the articles, he may purchase others at that price.   But it is manifest that this would not remunerate him where the article could not be obtained elsewhere, or where from restrictions on its production, or other causes, its price is necessarily subject to considerable fluctuation."   This shows that the market price is not an invariable standard, and that the converse of the case then before Judge Lewis is equally true—that is to say— when the market price is unnaturally inflated by unlawful and fraudulent practices, it cannot be the true means of ascertaining, what is just compensation.   It is as unjust to the seller to give the purchaser more than just compensation, as it is to the purchaser to give him less.   Right upon this point, we have the language of this court in the case of a refusal by a purchaser to accept: Andrews *v.* Hoover, 8 Watts 240.   It is said: "The jury is bound by a measure of damages where there is one, but not always by a particular means for its ascertainment.   Now the measure in a case like the present, is the difference between the price contracted to be paid and the value of the thing when it ought to have been accepted; and though a resale is a convenient and often satisfactory means, it does not follow that it is, nor was it said in Girard *v.* Taggert, to be the only one.   On the contrary, the propriety of the direction there, that the jury were not bound by it, if they could find another more in accordance with the justice of the case, seems to have been admitted; the very thing complained of here."   Judge Strong took the same view in Trout *v.* Kennedy, 11 Wright 393.   That was the case of a trespasser, and the jury had been told that the plaintiff was entitled to the just and full value of the property, and if at the time of the trespass the market was depressed, too much importance was not to be given to that fact.   "If (says Judge Strong) at any particular time, there be no market demand for an article, it is not of course on that account of no value.   What a thing will bring in the market at a given time, is perhaps the measure of its value then; but it is not the only one."   These cases plainly teach that value and market price are not always convertible terms; and certainly there can be no difference in justice or law, in an unnatural depression and an unnatural exaltation in the market price—neither is the true and only measure of value.

These general principles in the doctrine of damages and authorities, prove that an inflated speculative market price, not the result

[Kountz *v.* Kirkpatrick.]

of natural causes, but of artificial means to stimulate prices by unlawful combinations for the purposes of gain, cannot be a legitimate means of estimating just compensation. It gives to the purchaser more than he ought to have, and compels the seller to pay more than he ought to give, and it is therefore not a just criterion. There is a case in our own state, bearing strongly on this point: Blydenburgh *et al. v.* Welsh *et al.*, Baldwin's Rep. 331. Judge Baldwin had charged the jury in these words : " If you are satisfied from the evidence, that there was on that day a *fixed* price in the market, you must be governed by it; if the evidence is doubtful as to the price, and witnesses vary in their statements, you must adopt that which you think best accords with the proof in the case." In granting a new trial, Judge Hopkinson said : " It is the price—the market price—of the article that is to furnish the measure of damages. Now what is the price of a thing, particularly the market price ? We consider it to be the *value*, the rate at which the thing is sold. To make a market, there must be buying and selling, purchase and sale. If the owner of an article holds it at a price which nobody will give for it, can that be said to be its market value ? Men sometimes put fantastical prices upon their property. For reasons personal and peculiar, they may rate it much above what any one would give for it. Is that the value ? Further, the holders of an article, flour, for instance, under a false rumor, which, if true, would augment its value, may suspend their sales, or put a price upon it, not according to its value in the actual state of the market, but according to what in their opinion will be its market price or value, provided the rumor shall prove to be true. In such a case, it is clear, that the asking price is not the worth of the thing on the given day, but what it is supposed it will be worth at a future day, if the contingency shall happen which is to give it this additional value. To take such a price as the rule of damages, is to make the defendant pay what in truth never was the value of the article, and to give to the plaintiff a profit by a breach of the contract, which he never would have made by its performance."

The case of suspended sales upon a rumor tending to enhance the price, put by Judge Hopkinson, bears no comparison to the case alleged here, where a combination is intentionally formed to buy up oil, hold it till the year is out, and thus force the market price up purposely to affect existing contracts, and compel the sellers to pay heavy damages for non-fulfilment of their bargains. In the same case, Judge Hopkinson further said : " We did not intend that they (the jury) should go out of the limits of the market price, nor to take as that price whatever the holders of the coffee might choose to ask for it; substituting a fictitious, unreal value, which nobody would give, for that at which the article might be bought or sold." " In determining," says an eminent writer on

contracts, "what is the market value of property at any particular time, the jury may sometimes take a wide range; for this is not always ascertainable by precise facts, but must sometimes rest on opinion; and it would seem that neither party ought to gain or lose by a mere fancy price, or an inflated and accidental value, suddenly put in force by some speculative movement, and as suddenly passing away. The question of damages by a market value is peculiarly one for a jury:" Parsons on Contracts, vol. 2, p. 482, ed. 1857. In Smith *v.* Griffith, 3 Hill 337–8, C. J. Nelson said: "I admit that a mere speculating price of the article, got up by the contrivance of a few interested dealers, is not the true test. The law, in regulating the measure of damages, contemplates a range of the entire market, and the average of prices, as thus found, running through a reasonable period of time. Neither a sudden and transient inflation, nor a depression of prices, should control the question. These are often accidental, promoted by interested and illegitimate combinations, for temporary, special and selfish objects, independent of the objects of lawful commerce; a forced and violent perversion of the laws of trade, not within the contemplation of the regular dealer, and not deserving to be regarded as a proper basis upon which to determine the value, when the fact becomes material in the administration of justice." I may close these sayings of eminent jurists with the language of Chief Justice Gibson, upon stock-jobbing contracts; Wilson *v.* Davis, 5 W. & S. 523: "To have stipulated," says he, "for a right to recruit on separate account, would have given to the agreement an appearance of trick, like those of stock-jobbing contracts, to deliver a given number of shares at a certain day, in which the seller's performance has been forestalled by what is called cornering; in other words, buying up all the floating shares in the market. These contracts, like other stock-jobbing transactions, in which parties deal upon honor, are seldom subjected to the test of judicial experiment, but they would necessarily be declared fraudulent."

Without adding more, I think it is conclusively shown that what is called the market price, or the quotations of the articles for a given day, is not always the only evidence of actual value, but that the true value may be drawn from other sources, when it is shown that the price for the particular day had been unnaturally inflated. It remains only to ascertain whether the defendant gave such evidence as to require the court to submit to the jury to ascertain and determine the fair market value of crude oil per gallon, on the 31st of December 1869, as demanded by the defendant in his fifteenth point. There was evidence from which the jury might have adduced the following facts, viz.: That in the month of October 1869, a number of persons of large capital, and among them Kirkpatrick & Lyons, combined together to purchase crude oil,

[Kountz *v.* Kirkpatrick.]

and hold it until the close of the year 1869; that these persons were the holders, as purchasers, of a large number of sellers' option contracts, similar to the one in suit; that they bought oil largely, and determined to hold it from the market until the year 1870 before selling; that oil, in consequence of this combination, ran up in price, in the face of an increased supply, until the 31st day of December 1869, reaching the price of seventeen to eighteen cents per gallon, and then suddenly dropped as soon as the year closed. Major Frew, one of the number, says: It was our purpose to take the oil, pay for it, and keep it until January 1st 1870, otherwise we would have been heading the market on ourselves. Mr. Long says that on the 3d of January 1870 he sold oil to Fisher & Brother (the plaintiffs) at thirteen cents a gallon, and could find no other purchaser at that price. Several witnesses, dealers in oil, testify that they knew of no natural cause to create such a rise in price, or to make the difference in price from December to January. It was testified, on the contrary, that the winter production of oil was greater in December 1869 than in former years by several thousand barrels per day, a fact tending to reduce the price, when not sustained by other means. Mr. Benn says he knew no cause for the sudden fall in price on the 1st January 1870, except that the so-called combination ceased to buy at the last of December 1869.

It was, therefore, a fair question for the jury to determine whether the price which was demanded for oil on the last day of December 1869 was not a fictitious, unnatural, inflated and temporary price, the result of a combination to "bull the market," as it is termed, and to compel sellers to pay a false and swollen price in order to fulfil their contracts. If so, then such price was not a fair test of the value of the oil, and the jury would be at liberty to determine, from the prices before and after the day, and from other sources of information, the actual market value of the oil on the 31st of December 1869. Any other cause would be unjust and injurious to fair dealers, and would enable gamblers in the article to avail themselves of their own wrong, and to wrest from honest dealers the fruits of their business. It cannot be possible that a "corner," such as took place a few weeks since in the market for the stock of a western railroad company, where shares, worth in the ordinary market about sixty dollars each, were by the secret operations of two or three large capitalists, forced up in a few days to a price over two hundred dollars a share, can be a lawful measure of damages. Men are not to be stripped of their estates by such cruel and wrongful practices; and courts of justice cannot so wholly ignore justice as to assume such a false standard of compensation. Our views upon the effect of the affidavit of defence, on which the learned judge in a great measure ruled the question of damages,

[Kountz *v.* Kirkpatrick.]

will be expressed in the case of Kountz *v.* The Citizens' Oil Re
fining Co., in an opinion to be read immediately.

 Judgment reversed, and a *venire facias de novo* awarded.

 SHARSWOOD and WILLIAMS, JJ., dissented on the question of the
measure of damages.