# Seward, Appellant, *v.* Pennsylvania Salt Manufacturing Co.

*Contracts — Sales — Failure to deliver — Action of damages — Market value—Evidence.*

In an action for damages, for breach of contract for failure to deliver, the measure of damages is ordinarily the difference between the contract price and the market value of the commodity at the time or times and place of delivery, with interest.

Where the contract is to be performed in installments, the damages for the breach must be measured as of the time when each installment was due.

The law, in regulating the measure of damages, contemplates a range of the entire market, and the average of prices as thus found, running through a reasonable length of time.

Generally speaking, the price for which an article is bought and sold constitutes its market value and is ordinarily the best and most satisfactory standard by which to estimate the amount at which the same or similar articles are to be appraised in the assessment of damages.

Where it appeared that the merchandise in question was not procurable by importation during the contract period and was produced by only three concerns in the United States, including the defendant, it was error in the court to overrule an offer by the plaintiff to prove, for the purpose of establishing market value, all of the sales of this merchandise in any quantities made during the contract period by each of the producers thereof in the United States. The fact that none of these sales were of a quantity equal to that specified in the plaintiff's contract did not affect the case, especially as all of the quotations, even for car-load lots, were by the pound.

Argued October 19, 1921. Appeal, No. 239, Oct. T., 1921, by plaintiff, from judgment of C. P. No. 1, Phila. Co., June T., 1917, No. 5548, on verdict for plaintiff in the case of George O. Seward v. Pennsylvania Salt Manufacturing Company. Before ORLADY, P. J., PORTER, HENDERSON, HEAD, TREXLER, KELLER and LINN, JJ. Reversed.

Assumpsit for breach of contract. Before PATTERSON, J.

The facts are stated in the opinion of the Superior Court.

Verdict for plaintiff for $5 and judgment thereon. Plaintiff appealed.

*Errors assigned* were various rulings on evidence, in overruling plaintiff's offer of proof covering the production and the sources of supply of hydrate alumina and all sales of that material by the several manufacturers or producers thereof in the United States during the contract period, the charge of the court and refusal to grant a new trial.

*L. S. Oliver,* of *Weill & Oliver,* and with him *Clifford Seasongood,* of the New York Bar, for appellant.—The offer of proof by the plaintiff to establish market value was clearly admissible: Everett v. Delp, 67 Pa. Superior Ct. 47; 10 R. C. L. 955; 22 C. J. 185; 22 C. J. 187; Par-

menter v. Fitzpatrick, 135 N. Y. 190; Laubaugh v. Penna. R. R. Co., 28 Pa. Superior Ct. 247.

*William Findlay Brown,* and with him *Charles B. Downs,* for appellee.—The question in this case has already been determined by the Supreme Court in the appeal following the first trial, in Seward v. Pennsylvania Salt Manufacturing Co., 266 Pa. 457.

A market value may be shown by sales, but they must be sales and prices of a similar kind and quantity of goods as was the subject-matter of the contract. Righter v. Clark, 60 Atl. 741, 742, 112 Am. St. Rep. 78; Tuttle Chapman Coal Co. v. Coaldale Fuel Co., 136 Iowa 382, 113 N. W. 827; Sedgwick on Damages, 4th Ed. 260; Theiss v. Weiss, 166 Pa. 9, 17; Lloyd v. Haugh, 223 Pa. 148-156; Burton v. Miller, 227 Pa. 143.

OPINION BY KELLER, J., March 3, 1922:

Defendant (appellee), having contracted to sell and deliver to plaintiff (appellant), one hundred tons of hydrate alumina per month, from March to December, 1916, inclusive, at four cents per pound, f. o. b. Natrona, Pa., in bags, refused to perform the contract, and this action for damages followed. The measure of damages in such circumstances is ordinarily the difference between the contract price and the market value at the time or times and place of delivery, with interest: Sales Act of 1915, P. L. 543, section 67 (3) p. 562; and where, as here, the contract is to be performed in installments, the damages for the breach must be measured as of the time when each installment was due: 17 Corpus Juris 850; 24 R. C. L. 72, 73; 2 Sedgwick on Damages (8th ed.), section 737, p. 430. The breach was "a continuing one, or a succession of breaches," during the ten months in which the defendant was bound to deliver the hydrate alumina: Honesdale Ice Co. v. Lake Lodore Imp. Co., 232 Pa. 293, 301; and plaintiff was entitled to "recover the difference between the contract and the market price.

[value] as of the date of the breaches": Shreve v. Brereton, 51 Pa. 175, 185. This was recognized as the general rule in Morris v. Supplee, 208 Pa. 253, p. 258, though not applicable in that case because of its special circumstances, which are not here present. See also Williston on Sales, p. 991; Brown v. Muller, L. R. 7 Exch. 319.

At the first trial of the case the plaintiff's only proof of market value was evidence of the price for which he himself had contracted to resell twenty-five tons of the March delivery, and the prices at which defendant had supplied its other customers during the months in question. On appeal to the Supreme Court judgment for the plaintiff in substantial damages was reversed and a new trial granted, the court saying, through Mr. Justice WALLING: "These sales [of the defendant] were individual transactions in comparatively small amounts, not at all corresponding to that here in question, nor shown to have been made in the open market, and not sufficient to establish the market value especially of such quantities. Hydrate alumina is manufactured at other chemical works, but there was no evidence as to the price for which it there sold, or as to its general selling price in open market." After stating that the plaintiff had proved no actual damages and therefore the verdict could not be sustained upon that basis, if there were no available market, the opinion concluded: "In brief, unless the proof shows the subject of the contract had a market value and that greater than the contract price at the time of delivery, so as to bring the case within the general rule above stated the plaintiff can recover only nominal damages. The court erred in treating the evidence as sufficient to justify a finding of market value, and for that reason a new trial must be granted": Seward v. Pa. Salt Mfg. Co., 266 Pa. 457. The Supreme Court did not say that the evidence received was inadmissible, but that it was not sufficient to justify a finding of market value. Accompanied by other and more comprehensive evidence on the subject, the whole might be

sufficient to prove a market value in excess of the contract price and justify a verdict for substantial damages. The Supreme Court, likewise, did not hold that the market value could only be established by proof of the general selling price of the commodity in quantities approximating the contract, but on the contrary distinctly said: "Of course it may not at all times be possible to establish a general selling price and in such cases actual market value may be shown by proof of facts and circumstances, fixing, to a reasonable degree of certainty, the amount the property would bring if offered at ordinary sale (B. P. Ducas Co. v. Bayer Co., 163 N. Y. Supplement 32, 40), but the evidence here does not justify such a finding." p. 462.

To supply the lack of proof referred to in the opinion, the plaintiff, on the second trial, offered to prove that no hydrate alumina was, or could be, imported into this country during the period of the contract; that it was manufactured and sold by only three concerns in this country, including the defendant, the other two being the Aluminum Company of America and Merrimac Chemical Company, the last named being the owner of the American patent and the others, licensees under it; that the Aluminum Company of America used practically its entire output for manufacturing aluminum in its own factories, selling less than one-half of one per cent of such output, and had refused to state whether it would have accepted an order of this size. He proved that Merrimac Chemical Company sold only ten per cent of its output, using the rest in its business, and offered to prove that he had submitted the contract to that company and it would not accept it for delivery in 1916. He offered to prove every sale made by all three of these concerns, and their respective prices, during the contract period, the largest of the defendant being for one hundred tons, deliverable over a period of six months (July to December, inclusive), in carload lots of twenty tons each, at seven cents per pound, f. o. b. Natrona,

with the option to deliver more at the same price, if the buyer's needs exceeded that quantity, with many others ranging from five tons to twenty tons (aggregating as high as fifty-five tons to one purchaser), at prices substantially in excess of the contract price; the largest sale of the Aluminum Company of America (outside of sales to the Merrimac Company, being for six and one-half tons; and the largest of the Merrimac Company being for five and one-half and twelve and one-half tons respectively; that these sales were all of them at prices in excess of the contract price, and showed an increasing value or rising market for hydrate alumina; that a comparison of the sales in smaller quantities with the larger ones above referred to showed no considerable difference between them as to the price per pound, and established a general selling price for the commodity higher than the contract price and also a higher actual value; that the buyers of the larger quantities before making their purchases from defendant had secured quotations and made inquiries as to the prevailing market prices and based upon the results of such inquiries and their own purchases would testify that the market value of hydrate alumina in quantities covered by the contract in suit was at the time of the several breaches from five and a half to seven cents a pound, or one and a half to three cents per pound above the contract price; that the sales of the Merrimac Chemical Company, made after March, 1916, were at higher rates than the contract price and the twelve and one-half ton sale made in December, 1916, was very much higher, to wit, eleven cents per pound; that the market price, during the period of the contract, as shown by the Oil, Paint and Drug Reporter's quotations (that being a standard publication giving prices, quotations, etc., in the chemical trade), was largely in excess of the contract price.

The court below, under its construction of the Supreme Court's ruling on the first trial, rejected the offers and refused to admit any evidence as to sales unless

they were in quantities approximately as large as the entire quantity covered by the contract in suit, and there being no such sales, restricted the verdict in favor of the plaintiff to nominal damages. Plaintiff appealed.

We are not able to put the same construction on the opinion of the Supreme Court as was adopted by the learned trial judge.

At the first trial, the plaintiff's only evidence consisted of his own resale of twenty-five tons at five and one-half cents per pound and of single shipments under sales made by defendant. While competent evidence (Johnston v. Faxon, 52 N. E. 539-Mass.; Wilmoth v. Hamilton, 127 Fed. 48-C. C. A.), they were held insufficient of themselves to establish the market value of the quantity under contract, for it did not then appear that sales of approximately equal quantities to the contract in suit had not been made during the period covered by the contract by other producers. This would have furnished more satisfactory evidence on which to base the opinions of persons versed in the trade and cognizant of market rates and conditions. But such opinions are always ultimately based on sales (Parmenter v. Fitzpatrick, 135 N. Y. 190, 196, 31 N. E. 1032, 1034; Sanford v. Peck, 63 Conn. 486, 493-4, 27 Atl. 1057, 1058), and when every sale of a commodity made by its producers during the period in question is shown to the jury, it would seem that they were fully capable of determining the actual or market value at wholesale of such commodity. After all, the jury are the ultimate judges of values (Laubaugh v. P. R. R., 28 Pa. Superior Ct. 247; Dana v. Fiedler, 12 N. Y. 40, 48, 49), and if they have before them all the data, from a portion of which experts make up their opinions as to values, they should be able to determine with reasonable accuracy the market value of a salable product on a given date. In Kountz v. Kirkpatrick, 72 Pa. 376, where it was alleged the selling price of oil had been artificially inflated, the Supreme Court said, p. 391: "If so, then such price was

not a fair test of the value of the oil, and the jury would be at liberty to determine, from the prices before and after the day, and from other sources of information, the actual market value of the oil on the 31st day of December, 1869." The plaintiff in the instant case proposed to produce to the jury the range of the entire market, which it was said in Smith v. Griffith, 3 Hill 337 (N Y.)—quoted with approval in Kountz v. Kirkpatrick, supra, p. 390,—was what the law contemplated in fixing damages: "The law, in regulating the measure of damages, contemplates a range of the entire market, and the average of prices, as thus found, running through a reasonable period of time," p. 339. Generally speaking "the price for which an article is bought and sold constitutes its market value and is ordinarily the best and most satisfactory standard by which to estimate the amount at which the same or similar articles are to be appraised in the assessment of damages": 10 R. C. L. 955; 22 Corpus Juris 187, section 151; Sullivan v. Lear, 2 Southern 846 (Fla.); Slayton v. Drown, 107 Atl. 307 '(Vt.); Dolph v. Speckart, 186 Pac. 32 (Ore.); Hafner Mfg. Co. v. Lieber Co., 53 Southern 646 (La.); and "the evidence is not limited to the market prices for lots of the size contracted for, particularly where it is not shown that the buyer could have procured the quantity which the seller had agreed to deliver by a single purchase": 35 Cyc. 630; Dana v. Fiedler, 12 N. Y. 40; Frohlich v. Ind. Glass Co., 139 N. W. 5, 173 Mich. 428.

When this case was first tried it was not brought out that the deliveries by the defendant to the Macbeth-Evans Glass Company were made under a sale agreement for one hundred tons, in carload lots of twenty tons each, hence the Supreme Court had no reference to such transaction when it used the expression, "comparatively small amounts." When sales reach the dignity of carload lots, a jury might easily find that there was probably no great discrepancy between the price per pound of one carload or five, especially where the other

sales at the same period show no appreciable difference between the price per pound of one-half ton shipments and twenty-ton shipments, and when, as here, delivery of the monthly quota was not to be in one shipment, and was to be in bags. Such a condition presents no likeness to the comparisons suggested by the appellee, viz: the relation of a bucket of coal to carload lots, or of a bushel of chicken feed to 20,000 bushels of wheat. It may be of significance to note that all the quotations, even for carload lots, were by the pound.

Defendant itself proved that there was an open market for hydrate alumina during the period of the breaches. Its witness, Havens, was permitted to state his opinion as to the market value, based upon inquiries in the market and upon two sales to his company in February, 1916, aggregating two hundred and forty tons. Why was not the purchasing agent of the Macbeth-Evans Glass Company who bought one hundred tons from the defendant early in 1916 and another one hundred tons in May, 1916, after securing quotations from other producers and making careful inquiry into the selling prices then current, competent to state his opinion on the general market price? The president of the Merrimac Chemical Company, called as a witness by plaintiff to furnish a list of all sales made by his company during the contract period—plainly an unfriendly witness from his volunteered statements and explanations—stated on cross-examination that the market price of hydrate alumina during the period, March to December, 1916, was 3½ to 4 cents a pound, but admitted that prices on deliveries under an old contract extending to August, 1916, at $2.90 per hundred pounds had been raised to $5.35 after August, in shipments of seven to eight tons per month; and the offers would have shown that sales by his company in lots of five and one-half tons in November, 1916, were at eight and one-quarter cents a pound and of twelve and one-half tons in December, 1916, were as high as eleven cents a pound, with no sub-

stantial differences in price for smaller shipments. With the evidence of every sale made by the Merrimac Company during the contract period, as well as those of the other two producers, before them, why could not the jury determine just as well and just as accurately as the witness, what the market price for hydrate alumina was on the dates delivery should have been made by the defendant?

Ordinarily it is not possible to furnish evidence of every sale of a commodity made by all the producers or wholesalers in the country, and hence resort must be had to market reports and opinion evidence based on some of them; but when it is possible, when every sale during the contract period,—from a part of which expert witnesses for the defendant are able to testify as to market values,—is offered for the consideration of the jury, why is it not competent evidence, and why should the jury not be able from all of it to determine that which the defendant's witnesses have been able to deduce from a part? It must be remembered that these were not retail sales which were offered to fix wholesale values. They were sales of producers,—wholesalers,—offered as bearing upon wholesale values; and though none of them were in quantity equal to that under contract, some of them were not inconsiderable in amount and called for carload shipments extending over a period of months, and as to the rest, consideration could be given as to the difference in price, if any, between the large and smaller sales, and from them all a fair and accurate determination be made of the market value of a larger quantity deliverable at the rate of five carloads or one hundred tons a month. If it were otherwise a selling plunger could reap all the results of a falling market and escape all the consequences of a rising one by contracting to sell a larger quantity of goods than any other dealer.

Our views are supported by the authorities hereinbefore cited and we believe they are in full consonance with

the opinion of the Supreme Court in 266 Pa. 457, which, it is our desire, no less than our duty, to follow without questioning. We adopt the course here taken because we feel that a misconstruction has been placed by the lower court on the words of that opinion.

The third, fourth, fifth and ninth assignments of error are sustained. The judgment is reversed and a venire facias de novo is awarded.

LINN, J., dissents.