Neuman, Appellant, *v.* Corn Exchange National Bank and Trust Company.

444

Argued November 27, 1946. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

reargument refused April 18, 1947.

*Morris Wolf,* with him *Wolf, Block, Schorr & Solis-Cohen,* for appellant.

*Robert T. McCracken,* with him *Joseph W. Swain, Jr.,* and *C. Russell Phillips* and *Montgomery, Mc-Cracken, Walker & Rhoads,* for appellee.

OPINION BY MR. JUSTICE JONES, March 24, 1947:

This appeal grows out of an action in trespass for deceit. The plaintiff seeks damages which he claims to have suffered in a business transaction through his reliance upon an alleged misrepresentation by the defendant bank concerning the consideration said to have been offered by a third person for certain stock held by the bank as the executor of a decedent's estate. Under a subsisting contract that had been entered into by the defendant's decedent, the plaintiff and one other person (all owners of stock of like character), the plaintiff had a right of refusal to buy the estate's holding of the particular stock at the amount of a third person's offer.

The learned trial judge submitted the case to the jury which returned a money verdict for the plaintiff. Subsequently, the court en banc entered judgment for the defendant, n. o. v., and, at the same time, dismissed the defendant's motion for a new trial. All that is now before us, therefore, on the plaintiff's appeal is the action of the court below in entering the judgment for defendant. While, for the purposes of our review, we are required to accept the proven facts of record, as well as the reasonable inferences therefrom, which go to support the jury's verdict (*Zurcher v. Pittsburgh Railways Company*, 353 Pa. 212, 213-214, 44 A. 2d 581), the principal questions in the case are of law (1) as to whether the plaintiff pleaded and proved a legally cognizable cause of action and, if so, (2) as to the measure of damages applicable.

The W. A. Haller Co., Inc., a corporation located in Pittsburgh, Pennsylvania, and engaged in the business of rectifying, blending and selling whiskey, had a capital stock consisting of 5000 shares of voting stock (Series B) and a negligible number of non-voting shares (Series A). On July 7, 1941, Theodore G. Stein, Harold S. Laden and Hyman C. Neuman, the present plaintiff-appellant, having negotiated the purchase of 2500 voting shares of Haller stock (Series B), agreed *inter se* by contract in writing concerning their respective rights and liabilities as the purchasers and owners of such stock. Among other things, they thereby apportioned the 2500 shares, so purchased, in lots of 841⅓ shares to Laden, 841⅓ shares to Neuman and 817⅓ shares to Stein. As Stein already owned 24 shares of like stock, his then aggregate holding was 841⅓ shares also. By a further provision of the contract, the parties thereto pledged themselves, one to the other, that ". . . should either one, at any future time, desire to sell his holdings, he will before effecting such sale, give the refusal to the two remaining parties, at the same price as he may

be able to obtain from any other person or persons, and the two remaining parties shall have the right to purchase an equal number of shares so offered. The party to this agreement making the offer to sell shall give to the remaining parties an option for thirty (30) days from the date of making the offer to sell. If one of the remaining parties does not wish to purchase the amount offered, then his rights are automatically transferred to the other".

Subsequently, Laden, Neuman and Stein acquired additional stock in the Haller company so that, together with one W. A. Haller, they ultimately owned the whole of the 5000 outstanding voting shares (Series B) of the capital stock of the company in approximately equal quarter interests, Stein's holding amounting to 1241⅓ shares. While the option above-mentioned originally attached only to the 841⅓ shares of Haller stock held respectively by each party at the time of the making of the contract of July 7, 1941, the defendant bank, as Stein's personal representative, later extended the option to the whole of his 1241⅓ shares as will appear.

On June 5, 1943, Stein died. His will named as the executor thereof the defendant bank which duly qualified and began the administration of the decedent's estate. In addition to the 1241⅓ shares of Haller stock owned and held by Stein's estate, it also owned warehouse certificates for 1000 barrels of bourbon whiskey stored in the warehouse of an Indiana distillery. The whiskey had an O. P. A. ceiling price of $53,963.79 for the lot. It had a value, however, for "blending" [1] purposes far in excess of its legally permissible sale price, as was well known and recognized. The learned trial judge, in his charge to the jury, stated, without exception from anyone, that "It is not denied here that this whiskey had a

---

[1] "Blending", as explained at bar by appellant's counsel, is the euphemistic term applied to a practice whereby a quantity of whiskey is greatly increased by mixing it with "neutral spirits" derived from grain, cane or other vegetable matter.

value greatly in excess of the ceiling price". It is to be assumed that the jury found to the same effect, as it had a right to do under the evidence in the case; and the fact so found is conclusive here on the record now before us.

The bank sold the whiskey certificates at the ceiling price to one Isadore H. Schweidel under an agreement which required him to make an offer of $45,000 for the Stein estate's 1241⅓ shares of stock in the Haller company, subject, of course, to Neuman's and Laden's prior right to purchase the stock. On July 30, 1943, the stipulated day of Schweidel's settlement with the bank for the whiskey, he conformably signed a written engagement to buy the estate's Haller stock at $45,000 unless Neuman or Laden, the surviving parties to the agreement of July 7, 1941, elected to buy the shares in exercise of the above-specified option. Schweidel contemporaneously deposited with the bank $45,000 to guarantee performance of his undertaking to purchase the estate's stock in the Haller company. He was not interested in acquiring the stock. In fact, he did not want it but made his bid therefor only because he was required by the bank so to do in order to become the purchaser of the whiskey certificates.

Neuman, among a number of others, had offered to purchase the whiskey certificates from Stein's executor at their ceiling price but was never informed that the executor was receiving offers for the certificates on the basis that the purchaser thereof would obligate himself to buy the estate's stock in the Haller company at a certain price if called upon by the executor so to do.

After the whiskey certificates had been sold to Schweidel, as above stated, and his $45,000 deposit guaranteeing his offer for the stock was in the hands of the executor, the bank wrote Neuman a letter under date of August 6, 1943, which, after reciting the option provision of the 1941 agreement, continued as follows:

"We hereby notify you that as Executor under the Will of the said Theodore G. Stein, deceased, we do desire to sell his holdings, and we wish to advise you that we have entered into a contract of sale with I. H. Schweidel of this City for the decedent's 1241⅓ shares of stock for the sum of $45,000., which will be consummated unless you and Mr. Laden, or either of you, arrange to acquire the said stock at that price.

"This communication constitutes notice to you of our desire to sell and you must perfect your rights under the said agreement of July 7, 1941, within thirty days. If you can advise us within a shorter time whether or not you desire to acquire this stock, it will be appreciated. A notice similar to this is being sent to Mr. Harold S. Laden."

Laden renounced his right to participate in the purchase of the stock.

Neuman knew of Schweidel as a disbarred lawyer; considered him an undesirable prospective stockholder of a close corporation such as the Haller company; and desired to block his acquisition of the stock. To that end, in part at least, Neuman, on August 9, 1943, paid the bank $45,000 and received the estate's 1241⅓ shares of Haller stock. Neuman had not been told by the bank, nor did he otherwise know, that the bank had sold the whiskey certificates to Schweidel or that Schweidel's bid of $45,000 for the Haller stock was a prescribed condition precedent to his becoming the purchaser of the warehouse certificates at their ceiling price. It was August 13th following, or shortly thereafter, that Neuman first learned the true facts in such regard.

Upon an allegation that the actual worth of the Stein estate's Haller stock was $20,000, the plaintiff claimed damages accordingly on the theory that neither Schweidel nor anyone else would have bid more than that sum for the stock if sold independently of the whiskey certificates. Apparently finding $27,000 as the

actual worth of the stock and, therefore, the maximum limit of any possible *bona fide* bid by Schweidel or anyone else *for the stock alone,* the jury fixed the plaintiff's damages at $18,000. The jury's verdict further implies, and the evidence fully justifies the finding, that Schweidel's bid for the stock was a required "tie-in" to his purchase of the whiskey certificates and that the bank's statement to Neuman and Laden, that Schweidel's offer for the stock was $45,000, constituted a misrepresentation of a material fact by nondisclosure.

It is apparent that, in entering judgment for the defendant, the learned court below was unduly influenced by the thought that the plaintiff could not be deceived with respect to the value of stock in a company whereof he was a relatively large stockholder. That idea not only permeates the opinion for the court en banc but it is also imbedded in the appellee's printed brief both in the counterstatement of questions involved and in its argument. Of course, one cannot be deceived as to *the value* of stock concerning whose intrinsic worth he is fully informed. But, such a one can readily be deceived as to *the price* offered by a third person for stock if the owner or holder thereof avows as the offer an inflated price intended to cover additional valuable considerations secretly contemplated by the prospective seller and the outside offeror. The error in the opinion of the court below is due in large measure to its apparent failure to recognize that the instant suit is not based upon the contract for the sale of the stock. This is not an action for damages *ex contractu.* The cause of action in suit is the defendant's wrong in inducing the plaintiff by misrepresentation to pay considerably more for the stock than the amount of any *bona fide* offer for the stock which the defendant had from Schweidel or anyone else.

The primary inquiry on the question of liability is whether the plaintiff made out a case of damage to himself as the proximate result of his justifiable reliance

upon a factual situation which the defendant had falsely represented to him. The Restatement, Torts, § 525, succinctly comprehends the ingredients of a cause of action for deceit in the following language: "One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or refrain from acting in reliance thereon in a business transaction is liable to the other for the harm caused him by his justifiable reliance upon the misrepresentation". The rule is no different in Pennsylvania: see *Hexter v. Bast,* 125 Pa. 52, 71-72, 17 A. 252; *Cox v. Highley,* 100 Pa. 249, 252. To summarize,—there must be (1) a misrepresentation, (2) a fraudulent utterance thereof, (3) an intention by the maker that the recipient will thereby be induced to act, (4) justifiable reliance by the recipient upon the misrepresentation and (5) damage to the recipient as the proximate result.

The evidence in the instant case fully supports a finding by the jury that Neuman paid $45,000 for the Stein estate's Haller stock because of a material misrepresentation by the bank. Indeed, the facts which so demonstrate are not disputed. As personal representative of Stein's estate and in professed recognition of Neuman's rights under the 1941 agreement, the bank undertook to inform him with respect to Schweidel's putative offer for the stock. The bank did not tell Neuman, however, that the offer for the stock was an enforced "tie-in" price for Schweidel's then consummated purchase of the whiskey certificates. The right of a party to the 1941 agreement to purchase, in specified circumstances, the Haller company shares of another of the contracting parties contemplated that the price obtainable upon a bid from a third person would be a *bona fide* offer *for the stock* and nothing else. Here, Schweidel's offer of $45,000 for the stock was a required condition of his right to purchase the whiskey certificates at their ceiling price which, undeniably, was less than their real

value. In failing to tell Neuman that Schweidel's offer for the stock was an essential complement of his opportunity to acquire the whiskey certificates, the bank was guilty of a material misrepresentation. The deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does an intentional affirmation of a material falsity: see Restatement, Torts, § 529, comment a., and § 551; cf. also *Croyle v. Moses,* 90 Pa. 250, 252. The misrepresentation, whereof the plaintiff complains, did not relate to the *value* of the Haller stock, as the court below mistakenly conceived. It consisted of the deceptive factual understanding induced in Neuman's mind through the bank's failure to inform him concerning *the complete terms* of Schweidel's integrated offers for the whiskey *and* the stock. In substantial effect, Schweidel's offer of $45,000 was for the stock *and* the right to purchase the whiskey at its ceiling price, i. e., for actually less than the whiskey's well-known pecuniary value. As to that, Neuman was not informed either by the bank or otherwise prior to his paying the bank $45,000 for the stock on the basis of Schweidel's supposedly separate offer for the stock.

Under the evidence in the case, the questions of misrepresentation and the character of its utterance were for the jury. The bank well knew that its letter to Neuman did not embrace information as to all the considerations moving Schweidel to offer $45,000 ostensibly for the stock or that a valuable, but undisclosed, consideration of a sale of the stock to Schweidel would not pass to Neuman if he became the purchaser of the stock at $45,000. A misrepresentation is fraudulently made if the maker knows of its falsity when uttering it. Stated otherwise, "A misrepresentation in a business transaction is fraudulent if the maker . . . knows or believes the matter to be otherwise than as represented, . . .": Restatement, Torts, § 526. The maker's knowledge of the falsity of the representation fundamentally supplies

the element of fraudulent utterance required to make a misrepresentation actionable. Of course, an innocently made misrepresentation does not support an action for deceit: *Cox v. Highley,* supra, at p. 252. But, in the present instance, it is beyond dispute that the defendant knew the matter to be otherwise than it represented it to be to the plaintiff.

An intention on the part of the bank that Neuman be induced by the misrepresentation to act or refrain from acting in respect of the subject matter is equally manifest. When, in the opinion of Stein's executor, it became advisable to sell the estate's holding of Haller company stock, Neuman and Laden each had a contractual right to purchase such stock "at the same price as he [Stein or his executor] may be able to obtain from any other person or persons". It was in apparent obedience to that requirement that the bank gave Neuman the notice as to Schweidel's reputed offer for the stock and, at the same time, called upon Neuman to perfect his rights under the contract within the thirty-day period therein specified for that purpose. Indeed, the bank saw fit to suggest that Neuman accelerate his action if possible. But, regardless of that, on the bank's initiative the only course then open to Neuman was either to act or refrain from acting in the matter of the stock on the basis of the misrepresentation made by the bank. It cannot be, nor is it, denied that the bank's notice was for the express purpose of inducing Neuman to pursue promptly either one of the attendant two alternatives, viz., to buy or not to buy the stock for $45,000. And, thus, the intention of the maker of the misrepresentation to induce action by the recipient was indisputably present.

The plaintiff's reliance upon the bank's misrepresentation was justifiable. Such is now to be taken as conclusively established by the jury's verdict on the basis of facts and permissible inferences. Did not Neuman pay the bank $45,000 for the stock (more than twice what

he thought it was intrinsically worth) because he *believed* the bank's representation that Schweidel had offered $45,000 for the stock itself? That Neuman was justified in so relying on the bank's misrepresentation is obvious. The bank, as the holder and prospective seller of the Stein estate's Haller stock, was naturally the proper source of information concerning any offer which it received for the stock from a third party: cf. *Guffey v. Clever*, 146 Pa. 548, at pp. 552-553, approved p. 560, 23 A. 161. The contractual obligation to supply such information, both fully and accurately, rested upon the bank as Stein's representative. Even an independent inquiry of Schweidel would not likely have produced more than an added confirmation of the bank's half disclosure with respect to the character of Schweidel's intended purchase. In no event, was Neuman under any duty to make inquiry of Schweidel. It was the bank that had advanced the information in purported fulfillment of its bounden duty in the premises; and Neuman had a right to and, as the jury found, did accept as true the bank's representation. On its face, Schweidel's offer, as revealed by the bank, presumptively appeared to be for the stock and nothing else. There was no reason for Neuman to suspect that the sale of something in addition to the stock was tied to the offer and, particularly, not a scarce and much sought-after commodity which, being subject to O. P. A. regulations, could not legally be a constituent subject of a "tie-in" sales agreement: *Bowles v. Cudahy Packing Co.*, 154 F. 2d 891, 893 (C. C. A. 3); *United States v. Fish, Inc.*, 154 F. 2d 798, 800 (C. C. A. 2), cert. den. 326 U. S. [No. 4] XXIII; *Bowles v. S. S. Kresge Co.*, 59 F. Supp. 427, 428 (D. C. W. D. Mo.); *United States v. Armour & Co.*, 50 F. Supp. 347, 349 (D. C. D. Mass.). The rectitude of the bank's action was, therefore, all the more to be presumed in the circumstances,—a situation which the bank's subsequent attitude tended to confirm. Up until the time of trial,

the bank persisted in maintaining that it had not made a sale of the whiskey, "tied-in" to Schweidel's firm and guaranteed offer for the stock.

We come then to the remaining essential of an action for deceit, viz., that the plaintiff's justifiable reliance upon the defendant's fraudulently uttered misrepresentation was the proximate cause of the damage claimed. On the one hand, causation bears a close relation to the extent of a recipient's justifiable reliance upon an alleged misrepresentation while, on the other hand, it is related to the character and quantum of the damage said to have resulted therefrom. In part, the proximity of the cause depends on the degree of the reliance upon the misrepresentation and, in part, on the relationship of the reliance to the ultimate result. The rule in general is that "The maker of a fraudulent misrepresentation in a business transaction is liable for pecuniary loss caused to its recipient by his reliance upon the truth of the matter misrepresented if his justifiable reliance upon the misrepresentation is a substantial factor in determining the course of conduct which results in his loss": Restatement, Torts, § 546. So far as the uniformity of its application is concerned, the rule, as there stated, is unfortunately subject to the elasticity of the word "substantial". The English rule seems both more liberal and, at the same time, more susceptible of definitive application; thus, ". . . if the false statement of fact actually influenced the Plaintiff, the Defendants are liable, even though the Plaintiff may have been also influenced by other motives": per Lord Justice FRY of the Court of Appeal in *Edgington v. Fitzmaurice*, 29 Law Reports (Ch. Div.) 459, 485. Our own rule is nearer to that of the Restatement. In *Mullin v. Gano*, 299 Pa. 251, 256, 149 A. 488, this Court said that "The law does not require a deceived party to prove that defendant's false and fraudulent representations were the *'sole* reason and inducement for the plaintiff to invest his money'; it is sufficient that they 'constituted a *material* inducement'

thereto: Gillespie v. Hunt, 276 Pa. 119; Dunbar v. Preston, 285 Pa. 502". In any view, the present plaintiff's justifiable reliance on the defendant's misrepresentation was a "substantial factor" and a "material inducement" in causing him to part with $45,000 for the stock.

Of course, a showing of damage must yet be made. Without damage, causation effected by the deceit alleged is of no legal consequence: *Peters v. Stroudsburg Trust Company,* 348 Pa. 451, 35 A. 2d 341. What, then, were the damages, if any, which the plaintiff suffered and what is the applicable measure for their calculation? In an action for deceit or fraud in Pennsylvania, the plaintiff can recover only "his actual loss" and not "the value of his bargain". See *Peters v. Stroudsburg Trust Company,* supra at p. 453; *Curtis v. Buzard,* 254 Pa. 61, 64, 98 A. 777. Speaking for this Court in the *Peters* case, supra, Mr. Justice DREW quoted with approval (p. 454) from *Cunningham v. Ray,* 263 Pa. 492, 497, 106 A. 884, to the effect that ". . . the measure of damages in an action for deceit in the sale of property is the loss which the fraud inflicts, — that is, the difference between the *real,* or market, value of the property at the time of the transaction and the higher, or *fictitious,* value at which it was purchased". (Emphasis supplied).

As the foregoing rule has been applied where the misrepresentation or deception related to the *value* of the stock involved, the appellee takes occasion to point out that the value of the stock in the instant case was not misrepresented. That is true enough. Neuman's right to purchase the estate's stock was not concerned with the stock's value. His contractual privilege was to buy the stock for the price that the seller could obtain for it from any other person or persons. Conceivably, that price might readily be more or less than the value of the stock; and, so long as the third party offer was not incorrectly represented, Neuman could have no just cause for complaint. But, notwithstanding the apparent factual differentiation here present, the rule as to the measure

of damages applicable under the circumstances of the instant case can be no different than where the misrepresentation relates to the value of the stock sold. Reckoned ideally, the loss to the plaintiff in the present instance was the difference between the price which he was deceptively induced to pay for the stock and the *bona fide* price which a third person would have offered for the stock unrelated to anything else. Obviously, such an offer is no longer procurable, the bank having actually sold the stock to the plaintiff who was not obliged to rescind but was free to sue, as he has done, for the damages sustained: see *Guffey v. Clever,* supra, at p. 560. But, in no reasonable view, can the absence of a relevant third party offer operate to bar the plaintiff from recovering compensatory damages. The circumstances were not of the plaintiff's making, and the law constructively affords a just basis for the computation.

As was stated by former Chief Justice LEWIS in *Bank of Montgomery v. Reese,* 26 Pa. 143, 146, "The paramount rule in assessing damages is that every person unjustly deprived of his rights should at least be fully compensated for the injury he sustained". In *Kountz v. Kirkpatrick & Lyons,* 72 Pa. 376, 387, Mr. Justice AGNEW quoted from Sedgwick on Damages (4th ed., pp. 28, 29; also, pp. 36, 37) to the effect that " 'the declared object [of damages] is to give *compensation* to the party injured for the actual loss sustained' ". The learned Justice further noted that "Among the many authorities he [Sedgwick] gives, he quotes the language of C. J. Shippen, in Bussy v. Donaldson, 4 Dallas 206. 'As to the assessment of damages (said he), it is a rational and legal principle, that the compensation should be equivalent to the injury.' 'The rule,' said C. J. Gibson, 'is to give actual compensation, by graduating the amount of the damages exactly to the extent of the loss.' 'The measure is the actual, not the speculative loss:' Forsyth v. Palmer, 2 Harris 97. Thus, compensation being the true purpose of the law, it is obvious that the

means employed, in other words, the evidence to ascertain compensation, must be such as truly reaches this end." While formulated rules relating to the appropriate measure of damage in varying circumstances have to some extent become fixed, they are by no means immutable but bend to the exigencies of the particular case in order that just compensation may be ascertained and awarded. For example, "when the market price is unnaturally inflated by unlawful and fraudulent practices, it cannot be the true means of ascertaining what is just compensation". See *Kountz v. Kirkpatrick & Lyons,* supra, at p. 388, and the authorities there reviewed.

Here, the compensation to which Neuman is entitled is the amount by which the price he paid the bank for the stock exceeds the probable offer any third person would have made for the stock not coupled with any other valuable considerations. Schweidel's "tie-in" bid for the stock is, of course, without any evidentiary value on the inquiry as to what an outsider to the Haller company would have paid for the estate's stock in that company on the basis of the stock's own separate worth: cf. *Kountz v. Kirkpatrick & Lyons,* supra, p. 388. The learned trial judge permitted the jury to compute the plaintiff's damages on the basis of the actual value of the stock as disclosed by the books of the company. We think the trial court's action in such regard was entirely proper. It was at least eminently fair to the defendant. It is a just and reasonable inference that no third person would, in ordinary course, have paid more for the stock, itself, than its intrinsic worth. Indeed, where, as here, the stock for sale is but a minority interest in a close corporation, conducting a more or less speculative business, the prospect of obtaining an outside purchaser of the stock is slight and the prospect of such a one paying more for the stock than its actual value is slighter still. Cf. *Jones v. Costlow,* 349 Pa. 136, 140, 36 A. 2d 460.

The jury consequently found that $27,000 was the highest *bona fide* bid that a third party would have made for the stock. Thereupon the plaintiff's damages at once become determinable on a basis analogous to the situation present in *Guffey v. Clever*, supra. In that case the plaintiff had an option or right, as an incident of his lease of certain lands, to lease adjoining lands "on terms for the lease thereof that may be equal to the best terms offered by any other person or persons therefor". The plaintiff-lessee having indicated his desire to lease the additional premises, the defendant-owner informed him that he had a bid of $20,000 therefor from a named third party. Unknown to the plaintiff, the best offer that the owner in fact had was $10,000. The plaintiff leased the premises from the owner for $20,000 but, upon learning of the fraud, brought suit for $10,000 damages. The plaintiff obtained a verdict for the sum claimed whereon judgment was entered which this Court on appeal affirmed on the theory that the plaintiff had an absolute right to lease the property at $10,000, the highest *bona fide* offer from a third party.

The appellee bank makes certain contentions which we shall comment upon briefly. It argues that the plaintiff's testimony conclusively shows that he was not deceived by the misrepresentation but went ahead and bought the stock in the belief that the circumstances would support him in an action against the bank for damages. On the foregoing assumption of fact, the bank, citing § 548 of the Restatement, Torts, contends that the plaintiff is without a cause of action against it for deceit. The plaintiff's testimony concerning prospective litigation was not only oral but it was indefinite as well with respect to the character of legal action contemplated. It was therefore necessarily for the jury to which it was adequately submitted by the learned trial judge with appropriate instructions. The appellee further contends that Neuman's reason for buying the stock was his antipathy to Schweidel and the desire to prevent

the latter from becoming a stockholder of the Haller company and that Neuman would have paid any sum for the stock, in order to thwart Schweidel's becoming a stockholder of the Haller company, regardless of whether or not Schweidel's purported offer for the stock was related to his acquisition of the whiskey certificates. That contention proceeds upon a further assumption which, very evidently, the jury did not make. The argument utterly fails to touch the fact that a fictitious price for the stock was exacted from Neuman on the basis of the bank's false representation as to what Schweidel in any fair view had offered to pay *for the stock*. Finally, the appellee complains of the evidence from which the jury was permitted to deduce the actual worth of the stock. That matter does not relate to the cause of action but rather to the defendant's motion for a new trial which was denied and is not now before us.

The judgment is reversed and the cause remanded with directions to the court below to enter judgment on the verdict for the plaintiff.

## SUPPLEMENTAL OPINION SUR DEFENDANT'S PETITION FOR RE-ARGUMENT

PER CURIAM, April 18, 1947:

The petition for re-argument in this case discloses, and the court is further informed by Robert T. Mc-Cracken, Esq., of the law firm of Montgomery, Mc-Cracken, Walker and Rhoads, that, in the negotiations leading up to and culminating in the sale of both the whiskey certificates and the stock, the defendant Bank, as executor, consulted in such connection with representatives of said law firm whose members desire that it now be noted, as we herewith note at their request, that the bank's actions constituting the basis of this suit were taken on the advice of such counsel.

Reargument refused.