### LAZARUS v. BRESSLER.
Civil Action No. 4843.

District Court, E. D. Pennsylvania.
Jan. 23, 1948.

Jerome L. Markovitz, of Philadelphia, Pa., and Jacob S. Temkin, of Providence, R. I., for plaintiff.

Joseph W. Henderson and George M. Brodhead, both of Philadelphia, Pa., and John B. McGurl and H. G. Stutzman, both of Pottsville, Pa., for defendant.

FOLLMER, District Judge.

This case came on for trial before the Court, without a Jury, on April 15, 1947, and the Court having heard the testimony of the respective parties, the argument of Counsel, and being fully advised in the premises, makes the following Findings of Fact and Conclusions of Law:

Findings of Fact.

1. The plaintiff is a citizen of the State of Rhode Island, residing and having his place of business at 271 Fox Point Boulevard, Providence, Rhode Island.

2. The defendant is a citizen of the State of Pennsylvania, residing and having his place of business at Pine Grove, Pennsylvania.

3. The matter in controversy, exclusive of interest and costs, exceeds $3,000.

4. This action was brought by Samuel P. Lazarus as plaintiff against Clifford R. W. Bressler as defendant for the recovery of $30,000, with interest and costs, representing the purchase price of subscription rights to certain shares of stock in Mahanoy Coal Mining Company purchased by plaintiff from defendant as the result of alleged fraudulent representations by defendant to plaintiff.

5. Mahanoy Coal Mining Company was incorporated under the laws of Pennsylvania December 1, 1943, with a capitalization of $200,000 representing two hundred shares of common stock with a par value of $100 per share. The Company was formed for the purpose of mining coal in Pennsylvania. The product of the Company was to be sold through the agency of three broker-stockholders, Woolson, Flick and Bressler (the defendant), each to have the sale of one-third of the coal and each to receive a commission of five per cent. on coal delivered to stockholders to whom they sold stock.

6. Prior to the incorporation of the Company, plaintiff purchased from Woolson subscription rights for twenty-five shares of stock in the Company for the sum of $2,500, taking the same in the name of his wholly owned Petroleum Service Company.

7. Shortly after the incorporation of the Company its Board of Directors formally adopted a plan for coal allocation among the stockholders whereby each stockholder would receive one car of coal of each size produced by the mine for every twenty-five shares of stock, according to the priority in which the stock subscriptions were made. A letter from the President of the Company dated January 6, 1944, and captioned "Circular Letter to Stockholders—Re—Distribution of Coal" and addressed "To the Stockholders of Mahanoy Coal Mining Company" was forwarded to all stockholders. The plaintiff received a copy of this letter.

8. Being desirous of securing more stock against which he could get a larger allocation of coal, plaintiff, on April 13, 1944, solicited defendant to buy from the defendant some of his subscription rights to stock of the Company.

9. Plaintiff had received his proper allocation on the twenty-five shares of stock that he purchased from Woolson at the time of his negotiations with defendant.

10. By reason of his long association with the Company, dating from its organization, plaintiff was familiar with all the terms and conditions under which a subscriber was to receive coal from the Company.

11. The defendant when first approached on April 13, 1944, by the plaintiff was not desirous of disposing of any of his subscription rights but after further solicitation by the plaintiff, on the same day, the defendant advised plaintiff that he would dispose of subscription rights to one hundred fifty shares but that he wanted double the subscription price, or, namely, $200 per share, the sale to be for cash. No representation was made by the defendant to the plaintiff as to how much coal plaintiff would receive if he purchased the said subscription rights from defendant.

12. The plaintiff induced the defendant to sell the stock to him and the defendant did not induce the plaintiff to buy.

13. On April 14, 1944, the plaintiff accepted the offer of defendant to sell to him subscription rights to one hundred fifty shares of Mahanoy Coal Mining Company stock at the rate of $200 per share, and gave to the defendant two checks in payment therefor, both on Lincoln Trust Company, Providence, Rhode Island, one for $15,000, payable to the order of Cash and endorsed by the said Samuel P. Lazarus, and the other for $7,500, payable to the order of Clifford R. W. Bressler. The defendant deposited the checks, one in his bank account at Hazleton, Pennsylvania, and the other in his bank account at Pine Grove, Pennsylvania. At the time of the sale only one-half of the subscription price had been paid by the subscribers and the remaining one-half was subject to call by the Company.

14. Subsequently the Company called for the remaining one-half of the subscription and the plaintiff paid to Mahanoy Coal Mining Company the remaining one-half due on the subscription, amounting to $7,500.

15. The defendant, in connection with his offer to dispose of his subscription rights to the one hundred fifty shares stock, made no representation to plaintiff as to how much coal plaintiff would receive if he purchased the said subscription rights.

16. On April 22, 1944, Solid Fuels Administration notified Mahanoy Coal Mining Company that it was violating the rules and regulations of the said Administration, and ordered said Company to ship only on directives from said body.

17. The Company continued to ship according to its allocation plan until sometime in June, 1944, after which time it shipped coal on directives from the Solid Fuels Administration only, to such persons as were designated in said directives.

18. Neither the plaintiff nor his Company, Petroleum Service Company, had a base period according to Solid Fuels Administration regulations and were, therefore, ineligible thereafter to receive any coal from the Mahanoy Coal Mining Company.

19. The defendant on April 14, 1944, the day of the consummation of the sale by him to the plaintiff of the subscription rights aforesaid, notified the Secretary of the Mahanoy Coal Mining Company of the said sale and the plaintiff was thereupon invited to sit in on a meeting of the Board of Directors of Mahanoy Coal Mining Company held that day and accepted the invitation and attended the meeting.

20. The plaintiff became a director of Mahanoy Coal Mining Company as of June, 1944.

21. The plaintiff wanted only certain sizes of coal and instructed Mahanoy Coal Mining Company to ship to him no bank coal or fresh mined coal of pea size or smaller but to ship only fresh mined coal larger than pea. Plaintiff actually received more fresh mined coal than his allocation called for.

22. On July 28, 1944, the Mahanoy Coal Mining Company, a corporation, was voluntarily dissolved by resolution of the stockholders and of the Board of Directors thereof, and on August 7, 1944, Articles of Dissolution were filed with the Pennsylvania Department of State. The plaintiff was present as a director at the aforesaid Board meeting and further, personally signed the Articles of Dissolution.

23. On August 2, 1944, a limited partnership was formed known as the "Mahanoy Coal Mining Company, Ltd.," of which the plaintiff was a general partner. The Articles of Partnership were duly filed in the Office of the Recorder of Deeds of Luzerne County, and were personally signed by the plaintiff.

24. The plaintiff had a share in the partnership in proportion to his subscription rights to stock in the original corporation.

25. In November, 1944, the partnership was dissolved and a new corporation, "Mahanoy Coal Mining Company," was organized, February, 1945. The dissolution of the partnership was signed by the plaintiff.

26. The new corporation had an authorized capitalization of $400,000 and one John Rich received fifty-one per cent. of the capital stock of said corporation, so that the plaintiff's share in proportion to the whole was reduced.

27. No stock certificates were ever issued by the first Mahanoy Coal Mining Company, being the corporation in which the defendant sold his subscription rights to the plaintiff. That corporation was legally dissolved and the plaintiff, both as a stockholder and as a director, joined therein and assented thereto.

28. On April 11, 1945, the plaintiff addressed a letter to John Rich, who was then President of the then existing Mahanoy Coal Mining Company, stating, inter alia: "I am also writing to ask some advice of you. As you have already been informed, I bought $15,000.00, in stock from Mr. Clifford Bressler for which I paid double. My thought now is this. Would it pay me to go through law suits (which cost a considerable amount of money since lawyers do not work for nothing) or do you think that even at that price, in proportion to

earnings to be realized, I might be better off to hold up the suit."

## Discussion.

There is no dispute here as to certain basic facts, namely, the incorporation of the Company, its purpose and capitalization; its method of sale of its coal through the three stockholding brokers, Woolson, Flick and Bressler; its allocation plan to and among its stockholding customers; the preincorporation purchase by plaintiff from broker Woolson of the subscription rights to twenty-five shares of stock at par; that plaintiff had received his full proportionate share of coal on these twenty-five shares of stock at the time of his negotiations with defendant; that this purchase from Woolson was made by plaintiff in the name of his wholly owned Petroleum Service Company; that neither the plaintiff nor his Company, Petroleum Service Company, had a base period according to the regulation of Solid Fuels Administration; that plaintiff needed more coal than he could obtain on his proportionate allocation for his twenty-five shares of stock; that he solicited defendant to purchase from Defendant additional stock; that he did purchase from defendant the subscription rights to one hundred fifty shares of stock for which he paid double its par, i. e. $200 per share or a total of $30,000, for which he paid to Defendant $22,500 by two checks for $15,000 and $7,500 respectively, and subsequently to the Company the sum of $7,500 representing the then uncalled for fifty per cent. of the original subscription price of the stock; that plaintiff refused to accept bank coal and the smaller sizes of coal from pea coal down, otherwise known as steam coal; that shortly after the purchase by plaintiff from defendant of the subscription rights to one hundred fifty shares of stock, Mahanoy Coal Mining Company was advised by Solid Fuels Administration that it was violating the rules and regulations of the said Administration and ordered thereafter to ship only on directives from the Administration; that to qualify as one entitled to receive coal on these directives a base period was a prerequisite; that on the day of the sale plaintiff accepted an invitation to sit in at a meeting of the Board of Directors of the Company; that no stock certificates were ever actually issued by Mahanoy Coal Mining Company; that plaintiff subsequently was elected a director of Mahanoy Coal Mining Company and from the time of his election served actively as such director; that as such director he joined personally in the dissolution of the Company; that he joined personally in the formation of a limited partnership in which he qualified as a general partner, this partnership taking over the business and assets of Mahanoy Coal Mining Company; that plaintiff's interest in the partnership was the same as in the predecessor corporation; that as such partner he personally joined in the dissolution of the partnership and in the formation of a new corporation also known as "Mahanoy Coal Mining Company"; that this corporation had an authorized capitalization of $400,000 of which fifty-one per cent. was issued to one John Rich, so that plaintiff's original share in proportion to the whole was accordingly reduced.

There is, however, a sharp conflict in the testimony regarding the facts surrounding the sale of the stock by defendant to plaintiff. Plaintiff contends that when he contacted defendant for the purpose of getting more coal defendant replied that the only way for him to get additional coal was to buy more stock; that plaintiff then said to defendant that there was a Solid Fuels Administration Regulation which would prevent him, the plaintiff, from getting coal at that time, to which defendant replied that the Company's operation was a new one, not having operated before, and that the Government was encouraging such production; that the regulation did not affect a production that had not previously existed; that he, the defendant, had secured legal advice in relation to the order and that there was nothing to worry about; that if he, the plaintiff, purchased the stock he would get his full proportionate share of coal; that he, the defendant, went to the mines every day, was thoroughly familiar with them, and that plaintiff would get more coal than he could use. Plaintiff contends, however, that the Company was unable to deliver the coal; that such statements were fraudulent; that defendant

knew them to be fraudulent; that he, the plaintiff, was induced to purchase the stock because of such fraudulent statements.

Defendant contends that he was not interested in selling the stock; that the solicitation was solely that of the plaintiff; that the Company did take the position that the Solid Fuels Administration regulation was not applicable to their situation.

I am convinced, after hearing and carefully analyzing the testimony, that the sale of this stock by defendant to plaintiff was solely the result of the insistent solicitation of the plaintiff. Plaintiff had been a stockholder of the Company for approximately the same length of time as the defendant, and as such stockholder had received his full proportionate share of coal in accordance with the allocation plan set up by the Company; he was fully advised of the Company's operation and he bought the stock with his eyes wide open. I am further convinced that defendant made no inducing statements, true or false, to effect the sale. Mr. Altmiller, the President of the Company, did testify that it was their feeling that they were entitled to an exception from the Solid Fuels Administration regulation because they were a new company; that the coal they were producing was new coal on the market; that they did retain attorneys to endeavor to secure from the said Administration a favorable ruling but that they were unsuccessful. Admitting for the sake of argument that defendant did state to plaintiff at the time the negotiations for the purchase of the stock were pending (and which defendant denies) that he had secured legal advice in relation to the directive and that there was nothing to worry about and that if plaintiff purchased the stock he would get his full proportionate share of coal, I am fully convinced that defendant, in view of the position taken by the Company in relation to the directive, was honestly of the opinion that the Company would be permitted to continue to distribute its product as it had from its inception. Here again, the plaintiff could scarcely be classified as a babe in arms. He was, as a stockholder, in a position to be fully informed as to factual problems confronting the Company. As to the legal effect of the Solid Fuels Administration directive, plaintiff was as chargeable with knowledge as was the defendant. Assuming that certain representations were made by defendant to plaintiff which tended to induce the purchase of the stock, the plaintiff charged with knowledge of the directive and its legal effect, would be in the position of having entered into an illegal bargain and in consequence thereof cannot recover damages for breach thereof. Restatement of the Law of Contracts, Vol. II, Par. 598. There is certainly nothing in the testimony to the effect that aside from the restrictions of the Administration's regulations the plaintiff would not have gotten his full proportionate allotment of coal.

I find not a scintilla of evidence of fraud on the part of the defendant. This is not the case of a hidden consideration, nor one of a director-seller failing in his fiduciary obligation to a stockholder-buyer in withholding material facts affecting the value of the stock and known only to the seller because of the knowledge he obtained as a director. For the reasons stated Newman v. Corn Exchange National Bank & Trust Company, 356 Pa. 442, 51 A.2d 759, 52 A.2d 177, cited by plaintiff, is clearly distinguishable.

Secondly, plaintiff has not convinced the Court that he did not get his full share of coal prior to the effective date of the Administration directive. He deliberately refused to accept the allocation plan set up for the benefit of all the stockholders; he refused shipment of certain grades of coal and insisted upon having only certain designated grades. By reason of the fact that he had no base period within the meaning of the regulations, the Company was legally bound to refuse to ship him coal of any character after the date of the directive.

Lastly, plaintiff is not entitled to recover even if he had been induced to buy the stock because of false or fraudulent statements of the defendant, and I have previously indicated that I have not found the slightest suggestion of fraud in the case. He cannot have his cake and eat it too. Even on an assumption of fraud, plaintiff by his original inaction and, secondly, by his active participation in subsequent events

has made rescission impossible. He personally participated as a director in the dissolution of the first corporation, as a general partner in the formation and dissolution of the intervening partnership, and as a director in the formation of the second corporation of which fifty-one per cent. of the capital stock was issued against new money, thus reducing his proportion of the total capital stock.

The plaintiff found himself the unfortunate victim of a war time regulation and he charges fraud. He is not too sure, however, that he is taking the proper course and he writes Mr. Rich, the President of the present Company, and asks his advice as to whether it would pay him better to risk new money on lawyers who *"do not work for nothing"* or take his share of the earnings the new corporation would earn. It is significant that this letter is written long after he had ceased to receive coal and long after the unfolding of the successive steps in the Company's existence in which he, the plaintiff, was an active participant.

Assuming that the purchase was induced by fraud of the defendant, the plaintiff, as the defrauded party, could have affirmed or disaffirmed the contract when the fraud was discovered, yet he may not do both together, and if he concludes to abide by it as upon the whole advantageous, he shall not be afterwards permitted to question its validity. Woltjen v. Lauer, 2 Leg. Rec., Pa., 194.

### Conclusions of Law.

1. The Court has jurisdiction of the parties and of the subject matter of this suit.

2. The defendant sold his subscription rights to one hundred fifty shares in the Mahanoy Coal Mining Company on April 14, 1944, to the plaintiff in the ordinary course of business.

3. The defendant, at the time of making the sale, did not make any warranty or representation to the plaintiff what pro rata share of the production of Mahanoy Coal Mining Company he would receive as a result of the purchase of Clifford R. W. Bressler's said subscription rights.

4. The plaintiff who was a subscriber for stock prior to his purchasing subscription rights from the defendant knew the terms upon which the corporation was allocating its coal and was bound thereby.

5. The defendant at no time ever made to the plaintiff any false or fraudulent warranties, statements, promises or representations in connection with the sale on April 14, 1944, of his one hundred fifty subscription rights in Mahanoy Coal Mining Company to the plaintiff.

6. The plaintiff as a result of his actions as a director in the Mahanoy Coal Mining Company, in passing resolutions authorizing its dissolution and in signing the necessary and required legal documents to effect legally the said dissolution, has made the question which he raises in this case moot.

7. The plaintiff, by his own actions and execution of the necessary documents to dissolve the Mahanoy Coal Mining Company, has destroyed any legal rights he may have had in connection with the purchase of the subscription rights for one hundred fifty shares of stock of Mahanoy Coal Mining Company against the defendant.

8. The plaintiff, after the dissolution of the Mahanoy Coal Mining Company, then signed the necessary papers for entering into a limited partnership, and subsequently executed papers for the dissolution of that limited partnership, the assets of which were taken over by a new corporation with an enlarged capital structure and in which he became a stockholder, and thereby extinguished any legal rights he had against the defendant.

9. The doctrine of rescission of a contract of sale has no application to this case since plaintiff, by his own actions, has made it impossible to tender to the defendant the subscription rights or shares of stock called for by the original contract.

Judgment will be entered for the defendant in accordance with these Findings of Fact and Conclusions of Law.