MURSAU CORPORATION, Plaintiff,

v.

FLORIDA PENN OIL & GAS, INC., a corporation, Goldberg & Snodgrass, a law partnership, Lee H. Goldberg, Stewart R. Snodgrass, Christian E. Carlsen & David Graham, individuals, Defendants,

v.

Thomas H. MURRAY,
Third-Party Defendant.

Civ. A. No. 83–1759.

United States District Court,
W.D. Pennsylvania.

June 30, 1986.

William R. Sittig, Jr., Pittsburgh, Pa., for plaintiff and third party defendant.

Vincent J. Grogan, Dennis J. Roman, Grogan, Graffam, McGinley, Solomon & Lucchino, Howard Messer, Pittsburgh, Pa., for defendants.

## OPINION

COHILL, Chief Judge.

Presently before us are Motions for Summary Judgment filed on behalf of each Defendant. Having held oral argument and having reviewed the affidavits, depositions, briefs and other exhibits filed, we find no genuine issue as to any material fact. Consequently, we will grant these motions.

*Facts*

Plaintiff, Mursau Corporation ("Mursau"), through its President and majority stockholder, Thomas H. Murray, Esquire ("Murray"), purchased a limited partnership interest in Defendant Florida-Penn Oil & Gas, Inc.'s ("Fla-Penn") 1981-102 Drilling Program ("102 program"). Defendant Christian E. Carlsen ("Carlsen") is the President of Fla-Penn and Defendant David Graham ("Graham") is a stockholder of Fla-Penn. Defendant Goldberg & Snodgrass ("G & S"), a law firm in which individual Defendants Lee H. Goldberg ("Goldberg") and Stewart R. Snodgrass ("Snodgrass") are partners, was retained by Fla-Penn to structure the 102 program and prepare a tax opinion letter with regard to that program.

Mursau's acquisition of the limited partnership interest in the 102 program came about as a result of Murray contacting Goldberg in early October, 1981. Murray was interested in the 102 program as a tax shelter for Mursau. Since Mursau's fiscal year ended on October 31, Murray wanted to close the deal on or before October 30, in order to secure tax advantages for Mursau in 1981.

At his initial meeting with G & S, Murray was given a copy of a Private Placement Memorandum ("PPM") for an earlier Fla-Penn oil and gas partnership, the 101 program. He was told that the PPM for the 102 program would be materially similar but that the costs would be reduced proportionally according to the lesser number of wells to be drilled under the 102 program. The 101 program drilled 10 wells; the 102 program would drill only 4. Murray reviewed the PPM for the 101 program with independent counsel, Deposition of Thomas H. Murray, at P. 29, then signed a commitment letter for the 102 program. Supplemental Exhibit in Support of Motion for Summary Judgment, DX-3.

On October 29, 1981, Murray received a copy of the PPM for the 102 program which was in fact materially similar to the PPM for the 101 program. Supplemental Exhibits DX-1 and DX-2.

At the closing on October 30, 1981, Murray refused to tender a check on behalf of Mursau unless he was granted check-signing authority for the partnership, a demand clearly in conflict with the limited partnership agreement already signed by Murray. Supplemental Exhibit DX-2, at Exhibit I. Murray wanted that authority so that, after closing, he could dispute the payment of certain costs provided for in the PPM, including a finder's commission to the group securing the limited partners participation. Supplemental Exhibit DX-4, Transcript of proceedings at closing. As indicated by his notes comparing the costs under the 101 and 102 program, Murray was fully aware of the $49,600 finder's commission prior to the time set for closing. Supplemental Exhibit DX-6.

Although Murray initially walked out of the closing because of the refusal of Fla-Penn to acquiesce in his demands, he returned after a conversation with Snodgrass outside on the sidewalk. Murray deposition, at 120-123. Fla-Penn never acceded to Murray's demands. After the closing, Fla-Penn paid G & S $20,000 for legal fees and $49,600 as a finder's commission. Murray became aware of these payments sometime in December of 1981.

In the complaint, Murray essentially alleges three claims: 1) violations of the Securities Act of 1933, 15 U.S.C. §§ 77a-77bbbb (1981) ("the Act"); 2) Common-law fraud and conspiracy to defraud; and 3)

Breach of fiduciary duty arising out of an attorney-client relationship between Mursau and G & S and Goldberg and Snodgrass individually. Each of these claims are based on Murray's assertion that, by failing to inform him that the finder's commission would be paid to G & S if the deal closed, the Defendants omitted a material fact and defrauded him of $49,600.

The Defendants maintain that the 102 PPM as well as the 101 PPM, on which the 102 was modeled, disclose all material information. Both PPMs disclose the payment of legal fees to G & S and the finder's commission, Supplemental Exhibit DX-1, at P. 31; DX-2, at P. 30; both disclose the potential conflict of interest of G & S as counsel for the partnership and the general partner, DX-1, at P. 20; DX-2, at P. 19; both advise prospective limited partners to consult independent counsel, DX-1, at PP. 14, 27 and Ex. I §§ 6.01 & 7.02; DX-2, at PP. 13, 26 and Ex. I §§ 6.01 & 7.02.

### Securities Act of 1933

Plaintiff admits that the one-year statute of limitations prescribed under § 13 of the Act bars it from making a claim under § 12 or § 15 of the Act. However, Plaintiff argues that it still can maintain an action under § 17 of the Act. We need only address § 17(a) since the complaint fails to allege facts sufficient to raise a claim under § 17(b), in particular, use of interstate commerce.

■ Although the Third Circuit has yet to address the issue, the clear trend among the district courts of this circuit has been against implying a private right of action under § 17(a) of the Act. *See, e.g. Binkley v. Sheaffer*, 609 F.Supp. 601, 602–603 (E.D. Pa.1985); *In Re Cantanella and E.F. Hutton and Co.*, 583 F.Supp. 1388, 1419 (E.D. Pa.1984); *Warner Communications v. Murdoch*, 581 F.Supp. 1482, 1496 (D.Del. 1984); *Kimmel v. Peterson*, 565 F.Supp. 476, 483 (E.D.Pa.1983); *Hill v. Equitable Trust Co.*, 562 F.Supp. 1324 (D.Del.1983). In addition, we note that the Third Circuit Court of Appeals recently acknowledged that, with the exception of § 10(b), the trend generally has been "towards curtail-

ing the scope of implied rights of action." *Angelastro v. Prudential-Bach Securities, Inc.*, 764 F.2d 939, 948 (3d Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 267, 88 L.Ed.2d 274 (1986). We adopt, without reciting, the rationale already elaborated by the court in *Kimmel*, 565 F.Supp. at 482–488, and, following the trend in this circuit, we decline to imply a private right of action under § 17(a).

### Common Law Fraud

■ In order to state a claim of fraud or conspiracy to defraud, the plaintiff must allege the following elements: 1) a false or fraudulent representation of a material fact; 2) which defendants knew, or ought to have known, was false or fraudulent; 3) which is intended to be acted upon by plaintiff; 4) which in fact was acted upon justifiably by plaintiff; 5) to its detriment. *Contractor Utility Sales Co., Inc. v. Certain-Teed Corp.*, 748 F.2d 1151, 1154 (7th Cir. 1984) (applying Pennsylvania law), *cert. denied* — U.S. —, 105 S.Ct. 1397, 84 L.Ed.2d 785 (1985); *Marian Bank v. International Harvester Credit Corp.*, 550 F.Supp. 456, 461 (E.D.Pa.1982), *aff'd mem.*, 725 F.2d 668, 669 (3d Cir.1983). "[D]eliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than an intentional false affirmation." *Marian Bank*, 550 F.Supp. at 461, (citing *Neuman v. Corn Exchange National Bank and Trust Co.*, 356 Pa. 442, 51 A.2d 759 (1947)). However, a party is generally charged with knowledge which it can readily discover. *Id.*, at 462, 51 A.2d 759 (citing *Borelli v. Barthel*, 205 Pa.Super. 442, 211 A.2d 11 (1965)).

■ In the case *sub judice*, Plaintiff claims that he was defrauded by Defendants' nondisclosure of the fact that G & S would be entitled to the finder's commission if the deal closed. The record clearly indicates Plaintiff's understanding that, under the 101 and 102 PPM, the partnership would pay a finder's commission to the party responsible for obtaining a limited partner for the deal. Murray questioned Goldberg and Snodgrass specifically prior

to closing about a finder's fee for the person who introduced Murray to them. Murray deposition, at PP. 40–41; 100–101. At the closing, he objected to the partnership paying certain fees specified in the PPM's, including the finder's fee, without his express approval. At no time did Murray ask who, if anybody, would receive a finder's fee if the deal closed. *Id.*, at Vol. II, P. 24.

For several reasons, we conclude that Plaintiff has not shown any genuine issues of material fact which would support a claim of fraud. First, Plaintiff has not shown that the actual identity of the individuals eligible to receive the finder's fee was a material fact. In the securities context, a fact is material if there exists, "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757, 766 (1976). We disagree with Murray's contention that prior knowledge of G & S's entitlement to a finder's fee would have created concern over the reliability and objectivity of the tax opinion prepared by the firm.

As disclosed in both the 101 and 102 PPMs, the tax opinion was prepared on behalf of the partnership and the general partner. Supplemental Exhibits DX–1, at P. 21; DX–2, at P. 21. G & S was obliged to prepare the opinion letter regardless of whether it or anybody else succeeded in obtaining one or more limited partners' participation in the venture. Full disclosure was made with regard to the potential conflict arising between G & S and any limited partner as a result of the partnership's relationship with G & S. Supplemental Exhibits DX–1, at P. 21; DX–2, at PP. 20–21. At closing, this conflict was again disclosed since G & S represented Fla-Penn at that proceeding. Supplemental Exhibit DX–6, at PP. 1, 8–9. Due to the continued existence of this conflict, the PPMs repeatedly advise potential limited partners to secure independent counsel on all "legal, tax, accounting and related matters concerning [the] investment." Supplemental Exhibits

DX–1, at PP. 2, 8, 21; DX–2, at PP. 2, 8, 21.

Since G & S prepared its tax opinion on behalf of Fla-Penn, any potential investor would necessarily be concerned about its objectivity. For this reason, a prudent potential investor would consult independent legal and financial experts. Murray, in fact, did consult both an independent accountant and lawyer. Neither his accountant nor his lawyer expressed concern over the tax aspects of the deal. According to Murray, they each merely echoed his own concerns about the high front end charges involved. Murray deposition, at PP. 93–95, 57–58. A reasonable investor would not likely have done any more than Murray did, even with knowledge of the potential finder's fee available to G & S.

*Breach of Attorney-Client Relationship*

 In order to recover for a breach of fiduciary duty by an attorney, the plaintiff has a threshold burden of showing existence of an attorney-client relationship. The intent to create an attorney-client relation can be implied from the conduct of the parties where no express relationship exists. *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F.Supp. 725, 730 (D.Del.1985); *Connelly v. Wolf, Block, Schorr and Solis-Cohen*, 463 F.Supp. 914, 919 (E.D.Pa. 1978) (citing *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311 (7th Cir.1978)); *Committee on Professional Ethics & Grievances v. Johnson*, 447 F.2d 169, 174 (3d Cir.1971).

> Although the relationship of attorney and client may be implied from the conduct of the parties, such conduct must evidence an offer or request by the client for legal services and an acceptance of the offer by the attorney: *E.F. Hutton & Co. v. Brown*, 305 F.Supp. 371, 388 (S.D.Texas, 1969); 7 C.J.S., Attorney and Client, §§ 61–62, 65. It is clear that an attorney client relationship exists only with the consent of both parties.

*Connelly*, 463 F.Supp. at 919 (quoting *Pennsylvania Power & Light Co. v. Gulf*

*Oil Corp.*, 74 Pa.D & C.2d 431, 437 (C.P.Lehigh Cty 1975)).

■ As noted above, G & S's representation of the partnership and general partner was disclosed to Plaintiff, and Plaintiff was advised to obtain independent counsel. Murray admits that he did retain legal counsel who, on behalf of Mursau, met with G & S about the 102 plan. Murray received a bill and remitted payment to his independent counsel for legal services. Murray Deposition, Vol. II, at P. 57.

In contrast, Plaintiff paid no fees to G & S. As stated in the 102 PPM, the partnership paid G & S for adapting the 101 PPM for use in the 102 plan and for preparing the tax opinion letter to accompany the 102 PPM. The legal fees paid to G & S by the partnership did not include any amount for services rendered to the Plaintiff. Affidavit of Lee H. Goldberg; Affidavit of Stewart E. Snodgrass. Plaintiff concedes that the only legal advice he received from G & S concerned the tax aspects of the 102 plan. Murray Deposition, Vol. II, at PP. 49–50. We conclude that the legal advice on the tax consequences of the 102 plan was a service provided to and paid for by the partnership as part of its efforts to secure a limited partner for its venture.

Since we see no evidence from which we can imply an offer or request for services by Plaintiff, nor an acceptance of any such request by G & S, we must conclude that no attorney-client relationship was formed between Mursau, the limited partnership, and G & S. G & S did have an attorney-client relationship with the partnership and probably the general partner who organized the venture. Although Mursau indirectly benefitted by receiving the services G & S performed on behalf of the partnership to enable the partnership to attract a limited partner, it never requested, nor did it receive, other legal advice or services from G & S.

Even were we to find evidence from which an attorney-client relationship between G & S and Mursau could be inferred, as discussed above, we see no facts indicating any fraud or other breach tending to violate such a relationship.

Viewing the facts presented in a light most favorable to Mursau, the nonmoving party, we believe Defendants have met their burden of showing the absence of any genuine issue of material fact and are entitled to summary judgment pursuant to Fed.R.Civ.P. 56.

An appropriate order will follow.